**APPLIED DEVICES CORPORATION**

v.

**The UNITED STATES.**

No. 469–77.

United States Court of Claims.

Jan. 24, 1979.

**636**

Thomas J. Touhey, Washington, D. C., Attorney of Record for plaintiff; Henry G. Beauregard, Donald A. Tobin, Gerard J. Stief, and Sullivan, Beauregard, Clarkson, Moss, Brown & Johnson, Washington, D. C., of counsel.

Donnie Hoover, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Edward F. McGonigle, Crystal City, Va., of counsel.

Roger N. Boyd, Washington, D. C., filed brief for amicus curiae, RCA Corp.; John W. Chierichella and Jones, Day, Reavis & Pogue, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and SMITH, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case is before the court on cross-motions for summary judgment. Plaintiff seeks a Wunderlich Act (41 U.S.C. §§ 321, 322) review of an adverse decision of the Armed Services Board of Contract Appeals (ASBCA), styled *Appeal of Applied Devices Corp.*, ASBCA No. 18384, 77–1 BCA ¶ 12,-347 (January 7, 1977). A second count seeks equitable reformation of the contract. Our trial judge deemed the issues to be limited to issues of law, and so informed the court (Rule 166(b)). Therefore, we have not the benefit of a recommended decision by him as is more usual in such cases. Our conclusion, after briefing and oral argument, including an amicus brief on behalf of RCA Corporation and a government response thereto on the Wunderlich Act review, is that we agree with the ASBCA and find its decision free from legal error, not arbitrary or capricious, and supported by substantial evidence. So far as the claim is one for equitable relief, the claim is submitted on the administrative record, enabling us to dispose of it in this opinion, as we do. There is no triable issue of relevant fact. We hold that plaintiff is entitled to equitable reformation of the contract.

I

Plaintiff, a New York corporation in the electronics industry, bid on a formally advertised invitation proposing a three-step multi-year procurement, the legal incidents of which frame the issues here. Plaintiff offered to supply aircraft carrier radar systems, the specifications for which required considerable one-time design and starting expense. Delivery was to be in three annual installments, 5, 9, and 15 systems for fiscal years 1968, 1969, and 1970, respectively.

The contract terms required by ASPR § 1–322, and relied on by the board, are set forth as Appendix A to this opinion. They attempt to provide a means whereby a contract to be performed over a period of years may be awarded, obtaining the economies of volume purchasing, without obligating the entire contract price. To make a contract obligating funds not yet appropriated

is normally illegal, even criminal. 41 U.S.C. § 11, 31 U.S.C. § 665. Exemptions by statute are sometimes obtained, where a long-term job is a necessity and Congress perceives the absurdity of having to appropriate the entire cost before the contract is even awarded. This was the case, *e. g.*, in two recent decisions involving construction contracts, *S. A. Healy Co. v. United States*, 576 F.2d 299, 216 Ct.Cl. —— (1978); *C. H. Leavell & Co. v. United States*, 530 F.2d 878, 208 Ct.Cl. 776 (1976). The provision in a supply contract, as here, for installment delivery of multiple units over several years, is not so obvious a case for exemption, and yet we may assume that the aggregate cost would have been greater if separate contracts for each years' deliveries had been awarded. ASPR in § 1–322 attempts to provide needed legal machinery without help from any special legislation. The award of the contract obligates funds only for the first "program year." Funds are obligated for later years, and the contractor's obligation to perform comes alive, only upon a formal notice within a specified time that funds have become available. The economy in unit prices is achieved, however, only if the contractor expects to amortize his design and start up costs over the entire job. A stoppage due to lack of available funds, as for any other reason, would leave the contractor with costs unabsorbed by the prices for units already delivered, and, therefore, a "cancellation charge" is provided for, but it is subject to a "cancellation ceiling" to be agreed upon. In the event of any stoppage covered by the "cancellation charge" any additional compensation under the standard Termination Article is unavailable. Presumably the cancellation ceiling is deemed to obligate the funds needed to cover it, additional to the other obligations. Section 1–322.2(e).

Here, the "cancellation ceiling" in the event that occurred, unavailability, according to defendant, of funds for the 1970 installment, was but three percent of the total contract price. The figure was not negotiated but was prescribed by defendant, take it or leave it. The plaintiff bid, knowing that in the event of a 1970 cancellation the unabsorbed costs would much exceed three percent, indeed be more than double, but it went ahead and executed the contract, for reasons dealt with in the findings. It seems to have supposed it would be most unlikely it would have to rely on a cancellation charge to cover its costs as it deemed a failure by Congress to make funds available to be highly improbable, and did not take into account that funds made available by Congress might become unavailable "to the contracting officer" by decisions made elsewhere. The board found that defendant, for its part, in prescribing the three percent figure failed to estimate the nonrecurring initial costs in a realistic manner as ASPR 1–322.2(d) and (e) required. (The references in 1968 were 1–322.2(c) and (d)). It used a rule of thumb formula having no relation to the facts of the case. We can assume for purposes of our decision that defendant's officers simply violated plaintiff's entitlement to a realistic figure. Thus the errors and misconceptions of both sides set up the controversy we are to adjudicate.

Defendant found the necessary funds for 1969, and Congress appropriated funds that could have been used for 1970. However, the number of aircraft carriers in commission was being sharply reduced, and because of this it was decided to modernize existing radar of several carriers with "conversion kits" in lieu of the new systems plaintiff would have furnished in the 1970 installment. Accordingly, the Naval Electronics Systems Command (NAVELEX), to which cognizance of the contract had been transferred, concluded there was no "requirement" for the 1970 installment, and the board found as a fact, with this support of substantial evidence, that there was none. The board concluded that funds were not available to the contracting officer for the somewhat curious reason that he made no request for them. He advised plaintiff that the "1970 buy" would not be exercised. We think it is a fair inference from the evidence that the contracting officer did not request the funds because he knew that if he did request them, they would be refused.

Funds would not be allotted for a non-existent requirement. The exact statutory appropriation item is not given; we assume it was a general item available for other purposes than plaintiff's radar, so NAVE-LEX was in no way compelled by the appropriation language to spend the money for the "1970 buy," or let it lapse. We also assume, there being no finding to the contrary, that the funds in fact lapsed by non-use and were not diverted to other procurement.

Plaintiff of course does not argue the Navy should have funded a nonexistent requirement. Its first and most strenuously urged point is that upon the passing of the appropriation by Congress, the contracting officer could have terminated, if at all, only for convenience, making applicable the more generous settlement provisions of the standard termination article. In its view, once Congress appropriated funds, the limitation of government liability, when funds were not available, to the "cancellation ceiling" ceased to be applicable. Plaintiff says in any other contingency the defendant's options are to fund the installment or make a proper termination settlement. It says it consented to the inadequate "cancellation ceiling" because that would apply only in the unlikely contingency of Congress not making any appropriation; and the board's applying it to any other circumstances takes away valuable rights and reduces the contract to an option or requirements contract only.

Defendant relies on the contract language, which, in accord with ASPR 1–322.5 reads in part:

Upon availability to the Contracting Officer of additional funds sufficient for performance of the full requirements for the next succeeding Program Year, the Contracting Officer shall, not later than the due date specified in the Schedule, unless a later date is agreed to by the parties, so notify the Contractor in writing and the amount of funds described in the Schedule as available for contract performance shall be modified accordingly.

## II

■ We conclude, as did the board, that funds were not available *to the contracting officer* and so plaintiff never became entitled to receive the notice that they were available. The board referred to ASPR Committee Minutes of 31 July 1963 which showed that on a point made by the Navy member they all were in accord that funds were to be considered "available only when the contracting officer received notification thereof," not upon action by Congress. The words of the clause were revised by adding the emphasized words:

Upon availability *to the contracting officer* of additional funds  *  *  *.

Ordinarily, we see no reason for not referring to whatever "legislative history" exists when the mind labors to construe a regulation of the executive branch, but there may be a question about this in case of an ambiguous provision of a contract clause written by the government and proffered to the contractor for adhesion, where *contra proferentem* is the normal rule. Here, however, there is no ambiguity, and the historical reference is harmless because it only confirms the plain meaning. The reference to "funds sufficient for performance of the full requirements  *  *  *" also tends to support the idea that plaintiff could not expect to receive a notice when there were no requirements. It is a fallacy to suppose that requirements and funds availability exist in two separate universes of discourse. *Sidoran v. United States,* 550 F.2d 636, 213 Ct.Cl. 110 (1977). The "Cancellation Ceiling" becomes effective in the event of a notice that funds will not be available or a failure to give notice that they are available.

Plaintiff's contrary argument is that funds are available to the contracting officer if Congress appropriates them, without more. It attaches great weight to a dissent in *International Telephone & Telegraph v. United States,* 453 F.2d 1283, 197 Ct.Cl. 11 (1972). Indeed, the writer of that dissent, and of the opinion herein, has rarely encountered so much respect for opinions written by him even when for the court.

The case involved the same contract device as the instant one, but it was the contractor who wanted to be excused from delivering in later program years. It relied, successfully, on the written notice that funds were available being late a day or so, although funds were in fact available, and the contractor knew it. The dissent reasoned, hypothetically, that the defendant might want to get out of the contract and plaintiff might want to perform it in full (as in fact happened here); in that event the court majority had created a situation where the mere failure to perform a ministerial act, the mailing of a notice, might destroy a valuable vested right. But in considering what the right was, the dissent did not assert, as plaintiff does here, that funds are unavailable only if Congress does not appropriate them. It asserted the contrary, referring to possible interceptions by the President or the head of the department. It left open the case we have here, of the funds actually being available to the procuring activity, here NAVELEX, but intercepted by it, and expressed no opinion as to that except that it would "produce a most interesting question." As indeed it does. But with the added fact we have here, the entire absence of a "requirement," the answer seems clear. And defendant does not take here the outrageous position hypothetically imputed to it in the dissent, that even if the funds were available and some requirements existed, the contract could be destroyed just by failure to mail a letter, perhaps one telling the contractor what he already knew, and the contractor thereby restricted to the "cancellation ceiling." The dissent did not take into account this fact: if the "cancellation ceiling" were computed properly according to ASPR 1–322.2(c) the failure to mail a notice would not have the destructive effect the dissent anticipated. While the difference between the protection afforded by the contract to the contractor as we construe it, and that which it says it anticipated, respecting availability of funds, is certainly substantial, it cannot be said that a contract with a properly computed ceiling creates no valuable vested right. If the contract language does not make a

properly computed "cancellation ceiling" applicable to unavailability of funds from whatever cause, in later program years, the problem of how much money to obligate with the original contract award is left unanswered and the utility of the multiyear procurement clauses is much diminished, if not destroyed.

Plaintiff says the cancellation notice given it was irregular in that it failed to state that funds were unavailable. We cannot take this seriously in view of the fact that no notice would have had the same legal effect.

Plaintiff attempts to argue that there really was a requirement, and to prove it points to procurement of its radar systems in later years. We think, whether there was a requirement was a matter for the cognizant officers of the Navy, not this court, and that a determination of no requirement could be overturned only if it was plainly made in bad faith. Such might be the case, e. g., if the same or nearly the same item were procured from another contractor, at the same time, in a program year when the absence of requirement was asserted vis a vis this contractor. Plaintiff offers nothing like that, and the decommissioning of many carriers at about that time is, of course a matter of record and history.

It follows that plaintiff is not entitled to a settlement under the standard termination article. It follows likewise that the board's analysis of the case withstands Wunderlich Act review. It is supported by substantial evidence, it is not arbitrary or capricious, it is not contrary to law.

### III

■ That does not dispose of the case. The issue most troublesome to the court is to determine the consequences of defendant's failure, as found, to implement properly the ASPR requirement, then § 1–322.2(c) and (d), calling for the contracting officer to make a reasonable and realistic estimate of labor learning, and other nonrecurring costs for computation of the "cancellation ceiling." Section 1–322.2(c) read in part in 1968:

In determining cancellation ceilings, the contracting officer must estimate reasonable preproduction and other nonrecurring costs to be incurred by the prime or subcontractor which would be applicable to and which normally would be amortized to all items to be furnished under the multi-year requirements. They include such costs as plant rearrangement, special tooling, preproduction engineering, initial spoilage, and pilot runs. There shall not be taken into account any cost of labor or materials, or other expenses (except as indicated above) which might be incurred for production of the items subject to cancellation for each program year. The total estimate must then be compared with the best estimate of the procurement cost to arrive at a reasonable percentage figure. * * *

The word "realistic," quoted by the board, occurs in the following subparagraph (d):

Original cancellation ceilings may be revised from information developed after issuance of a solicitation discloses that such ceilings are not realistic. [sic]

The board in its conclusions says the provisions are not "mandatory" by which it seems to mean not enforceable by it in case of a contracting officer's failure to comply. This we may accept as correct since the avenue to relief in such a case we believe is by equitable reformation, which the board was not granted jurisdiction to accord at the time of its decision. (Pub.L. No. 95–563, the Contract Disputes Act of 1978, section 8(d), will change this in the future.) The board points out that the contractor should have protested the inadequacy of the "cancellation ceiling" before bid opening under ASPR 2–407.8(b). We can agree it certainly should have, and its failure to do so was blameworthy but not necessarily fatal to relief in this court. Clearly the contracting officer, under the board findings, abused his discretion, and such abuse is not sacrosanct against judicial review.

Here we have a case where plaintiff was blameworthy, but as pointed out in *Southwest Welding & Mfg. Co. v. United States,* 373 F.2d 982, 179 Ct.Cl. 39 (1967), the con-tractor's negligence does not bar reformation:

* * * This is especially true where the other party, rather than being harmed by the plaintiff's actions, has become an unintended beneficiary as has the Government in this controversy. * * * [*Id.* at 991, 179 Ct.Cl. at 54.]

This analysis applies here since the net result of the neglect of both parties is that defendant gets the deliveries of the first two program years for less than it would have, had it obeyed ASPR.

Plaintiff relies on the so-called "Christian doctrine," *G. L. Christian and Associates v. United States,* 312 F.2d 418, 160 Ct.Cl. 1, *rehearing denied,* 320 F.2d 345, 160 Ct.Cl. 58, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), by which ASPR requirements are regarded as parts of contracts as fully as if spelled out therein. *Accord, Chris Berg, Inc. v. United States,* 426 F.2d 314, 192 Ct.Cl. 176 (1970); *Newport News Shipbuilding and Drydock Co. v. United States,* 374 F.2d 516, 179 Ct.Cl. 97 (1967). We agree with plaintiff that the requirements of ASPR 1–322.2(c) and (d) are part of plaintiff's contract as fully as if stated therein, and proceed to determine where that gets the plaintiff. The said provisions were obviously written for the protection of bidders since they clearly are a main inducement for bidders to enter into multiple year installment contracts. As held in *Berg, supra,* the contract was made in violation of law when made in disregard of such a provision. This court in *Rough Diamond Co. v. United States,* 351 F.2d 636, 173 Ct.Cl. 15 (1965), *cert. denied,* 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966), carefully analyzed the differences in treatment between a contract written in violation of a provision of law enacted for the contractor's protection, and violation of a provision of law as to which it can only be said that the contractor derives an incidental benefit from the provision if it is observed. The contractor in the former case can obtain reformation and is not bound by his estoppel, acquiescence, and even failure to protest. *Berg, supra.* In cases of breach by the government subsequent to contract

award, the contractor can easily lose its remedies by failure to protest once the breach is known to it, as in *Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630, 201 Ct.Cl. 135 (1973), but such cases must be distinguished from those in which a breach of law is inherent in the very writing of the contract involved. In such cases reformation is available despite the initial adherence of the contractor to the contract provision now shown to be illegal. In *Berg* plaintiff was denied correction of a mistaken bid contrary to an ASPR provision. It adhered to the contract uncorrected yet it recovered.

Plaintiff is entitled to equitable reformation of the "cancellation ceiling" and a redetermination of the proper cancellation charge within the reformed ceiling percentage.

Accordingly, defendant's motion for summary judgment is denied and plaintiff's motion for summary judgment is denied as to its entitlement to a settlement under the standard termination article but granted as to its entitlement to reform of the three percent "cancellation ceiling." The cause is remanded to the trial division under Rule 131(c) for ascertainment of a proper cancellation charge in conformity with ASPR § 1–322(c) and (d), as they were at the time of contract award.

## APPENDIX A

### Pages 2, 3, 4, and part of 5, ASBCA Findings in Appeal of Applied Devices Corp. No. 18384

On 22 April 1968, the government issued the second step of the solicitation, which requested fixed price bids on 29 of the radar systems. The invitation provided that award would be made on the basis of "Multi-Year Procurement," then and now described in ASPR 1–322. Multi-year quantities of 5, 9 and 15 were set forth for fiscal years 1968, 1969 and 1970, respectively, and, in accordance with ASPR 1–322.5, the invitation included the following provisions:

"LIMITATION OF PRICE AND CONTRACTOR OBLIGATIONS (OCT. 1966)

(a) This clause applies only in the event this contract is awarded on the alternative basis for award described in the Schedule as 'Multi-Year Procurement'.

(b) Funds are available for performance of this contract in the amount specifically described in the Schedule, as available for contract performance. The amount of funds so described at the time of award is not considered sufficient for the contract performance required by and described in the Schedule for any Program Year other than the First Program Year. Upon availability to the Contracting Officer of additional funds sufficient for performance of the full requirements for the next succeeding Program Year, the Contracting Officer shall, not later than the date specified in the Schedule, unless a later date is agreed to by the parties, so notify the Contractor in writing and the amount of funds described in the Schedule as available for contract performance shall be modified accordingly. This procedure shall apply for each successive Program Year.

(c) The Government is not obligated to the Contractor for contract performance in any monetary amount in excess of that described in the Schedule or modifications thereto, as available for contract performance.

(d) The Contractor is not obligated to incur costs for the performance required for any Program Year after the first unless and until he has been notified in writing by the Contracting Officer of an increase in availability of funds in accordance with paragraph (b) of this clause. If so notified, the Contractor's obligation shall be increased only to the extent contract performance is required for the additional Program Year for which funds have been made available.

(e) In the event of termination pursuant to the 'Termination for Convenience of the Government' clause of this contract, the terms 'total contract price' as used in this clause refers to the amount available for performance of this contract, as provided for in this clause, plus the applicable amount established as the

cancellation ceiling, and the term 'work under the contract' as used in that clause refers to the work under Program Year requirements for which funds have been made available. In the event of termination for default, the Government's rights under this contract shall apply to the entire multi-year requirements.

(f) Notification to the Contractor of an increase or decrease in the funds available for performance of this contract as a result of a clause other than this clause (e. g., exercise of an option for increased quantities or the 'Changes' clause) shall not constitute the notification contemplated by paragraph (b) of this clause.

CANCELLATION OF ITEMS (OCT. 1966)

(a) This clause applies only in the event this contract is awarded on the alternative basis for award described in the Schedule as 'Multi-Year Procurement'.

(b) As used herein, the term 'cancellation' means that the Government is cancelling, pursuant to this clause, its Program Year requirements for items as set forth in the Schedule for all Program Years subsequent to that in which notice of cancellations is provided. Such cancellation shall occur only if, by the date or within the time period specified in the Schedule, or such further time as may be agreed to, the Contracting Officer (i) notifies the Contractor that funds will not be available for contract performance for any subsequent Program Year; or (ii) fails to notify the Contractor that funds have been made available for performance of the Program Year requirement for the succeeding Program Year.

(c) Except for cancellation pursuant to this clause or for termination pursuant to the 'Default' clause, any reduction by the Contracting Officer in the quantities called for under this contract shall be considered a termination in accordance with the 'Termination for Convenience of the Government' clause of this contract.

(d) In the event of cancellation pursuant to this clause, the Contractor will be paid, as consideration therefor, a cancellation charge not to exceed the cancellation ceiling described and separately set forth in the Schedule as being applicable at the time of cancellation.

(e) The cancellation charge is intended to cover only expenses reasonably necessary for production which would have been equitably amortized in the unit prices for the entire quantity of the Multi-Year Procurement but which, because of the cancellation, are therefore not so amortized. The cancellation charge shall be computed and claim therefor made as would be applicable under the 'Termination for Convenience of the Government' clause of this contract. The claim may include reasonable preproduction and other nonrecurring costs, applicable to and which normally would be amortized in all items to be furnished under the multi-year requirements, such as plant rearrangement, special tooling, preproduction engineering, initial rework, initial spoilage, and pilot runs. The claim shall not include any amount;

(i) for labor, materials, or other expenses, incurred for production of the cancelled items;

(ii) for any item or cost for which payment has already been made to the Contractor; or

(iii) for anticipated profit on the cancelled items, or on the costs including in the cancellation charge."

The invitation also included on Schedule page 19:

"The clause entitled 'Cancellation of Items' is modified by specifying the following:

(1) The cancellation dates referred to in paragraph (b) for the fiscal year(s) 1969 and 1970 are as follows:

FY 1969—15 June 1969
FY 1970—15 June 1970

(2) CANCELLATION CEILING: If award is made on the basis of ALTERNATE B—The cancellation ceilings referred to in paragraph (d) of the total contract price are as follows:

FY 1969 and FY 1970—7%
FY 1970          —3%

Pursuant to the clause entitled 'LIMITATION OF PRICE AND CONTRACTOR OBLIGATIONS' the date(s) by which the Contracting Officer shall notify the Contractor of the availability of funds for the applicable fiscal year(s) program is/are as follows:

FY 1969—15 June 1969
FY 1970—15 June 1970"