**NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellant,**

v.

**AMERICANA HEALTHCARE CENTER, Respondent-Appellee.**

No. 85–8213.

United States Court of Appeals, Eleventh Circuit.

Feb. 19, 1986.

Elliott Moore, Margaret Bezou, N.L.R.B., Office of the Gen. Counsel, Washington, D.C., for petitioner-appellant.

Clifford Nelson, Jr., Atlanta, Ga., for respondent-appellee.

Before RONEY and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge:

We have before us a petition by the National Labor Relations Board (NLRB) under 29 U.S.C. § 160(e), for enforcement of an order by it directed at Americana Healthcare Center (a/k/a Americare Healthcare Corporation, a Delaware Corporation), respondent (employer), requiring employer to cease and desist from denying its employees existing sick leave benefits to which it had agreed, and to take various other remedial actions as will appear. Laborer's International Union of North America, Local 438 (union) was the "Charging Party." We determine that the NLRB is entitled to have its order enforced, with some minor modification, but the facts are intricate and, among the volumes of NLRB litigation, almost if not quite unique, and require analysis at some length.

### Background

Employer was, up to about January 1, 1982, a subsidiary of Cenco, Inc., a corporation having its headquarters at Oakbrook, Illinois. Its business included a nursing home at Decatur, Georgia. On or about the above date, it became a subsidiary of Manor Healthcare Corporation, apparently headquartered in Maryland, and ceased to be a subsidiary of Cenco. Those of Employer's personnel having responsibility respecting this case left, and the case passed into the hands of persons having no personal knowledge of previous transactions and

* Honorable Philip Nichols, Jr., Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

scant enthusiasm for dealing with employee unions. However, Americana remained the employer throughout—the change in its parent companies not affecting its legal duties. Problems that may arise with a substitution of employers are not met here.

Employer, then known as DECA, a Limited Partnership d/b/a American Health Care Center of Decatur, had been the target of a previous NLRB order requiring it to bargain collectively with union; enforcement was granted by our predecessor Fifth Circuit, Unit B, 645 F.2d 69 (April 13, 1981, unpublished). The "bargaining unit" was "service and maintenance employees * * * including all nurses' aides, unit clerks, physical therapy aides, housekeeping employees" etc., at the Decatur facility, but excluding office and professional and technical employees, practical nurses, guards, and supervisors. Thereafter, May 8, Donnie M. Dennison designated himself representative of union for the bargaining, and on May 18, James E. Dick, Cenco's director of Human Resources, designated himself employer representative.

The findings of the administrative law judge (ALJ) in this new and present proceeding delve in detail into what happened next. Mr. Dick made repeated trips to Decatur, Georgia, for negotiating sessions, at which sometimes he was alone, other times accompanied by managerial employees from the local facility. This was the first negotiation between these parties, but Mr. Dick started with the form of contract used by Cenco at other of its facilities. Mr. Dennison always had with him at the sessions, various union members employed at the local facility.

Sick leave, which is the subject of the present litigation, early came under discussion. Mr. Dick stated that company policy then in effect was as follows:

Sick leave commences after 600 hours of employment. Each additional 200 worked accrues for paid hours up to 120 hours total. The benefit commences on the second day of excused absence. In December upon application, we will pay out up to one half of the remaining sick leave due.

We understand members of the bargaining unit were all hourly wage employees who were not paid for any hours not worked except as company policy, or (for the future) the collective bargaining agreement provided otherwise. Sick leave, if not used, would accrue as stated by Mr. Dick and presumably could be carried over from year to year, or "bought back" in December only to the limit of half the accrual. If used, the pay was a "benefit," not part of the regular wage.

It is undisputed that the union requested more favorable terms, but Mr. Dick, on behalf of Cenco, refused any improvement. It also seems pretty clear that the union gave up on this issue in November so that, at the final negotiating session in December 1981, the union was asking no more than Cenco had always been willing to grant. There really was nothing more to discuss concerning sick leave at this session. Mr. Dick, having assumed the role of "rapporteur" for the conferees, produced a final draft at a final meeting on January 5, 1982, which contained no clause respecting sick leave. The five union representatives present all signed it without reading it. They said they did this because they trusted Mr. Dick: he had earned their respect by his fairness and moderation during the many sessions.

The ALJ found as a fact that the parties had agreed December 9 on continuing the prior Cenco policy as to sick leave, and that a suitable clause was omitted from the contract by mutual mistake. The NLRB, adopting this finding, ordered the employer to amend the contract to make it incorporate such a commitment.

The employer, however, relied before the NLRB and before us on another provision that actually was in the contract. It is what is often called a "zipper" clause, but is nonstandard and is considered an even more difficult hurdle than such a clause usually is, for those who would insert in a contract a provision not textually found therein:

## ARTICLE XXVIII. WAIVER OF FURTHER BARGAINING

*Section 1.* The parties agree that this Agreement contains their full and complete understanding and that any prior practices, benefits or oral agreements are superseded by the terms of this Agreement. The parties further agree that no oral understandings, practices or benefits will be recognized or regarded as binding unless committed to writing and signed by the parties as a supplement to this Agreement and that the Company may, in its discretion, discontinue or modify the provision of any benefit or privileges not required under this Agreement.

*Section 2.* Since this Agreement expresses the understanding of the parties in respect to all matters deemed by them to be applicable to the Bargaining Unit, for the term of this Agreement, the Company and the Union each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter referred to or covered by this Agreement, or with respect to any subjects or matters not specifically referred to or covered by this Agreement, and even though such subjects or matters may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

*Section 3.* The Company does not by this Agreement waive any rights, legal or equitable, which it would otherwise have except as specifically defined and provided in this Agreement, which sets forth all understandings and agreements arrived at by the parties.

The parties negotiated over this provision as offered by Mr. Dick, and Mr. Dennison understood that one of its purposes was to enable the employer to change without negotiation any practice not made permanent in the contract. The ALJ thought, as we read him, that to employ the "zipper" clause to bar an amendment of the contract, *i.e.,* to insert an actual agreement, would be to make it operate contrary to the National Labor Relations Act, 29 U.S.C. § 158(d) (Act) provision which requires agreements between unions and employers to be put in writing. It is argued by the General Counsel that another mistake was adhesion to the "zipper" clause in ignorance of the existence of a necessary claim the "zipper" clause would invalidate because not in writing. The NLRB itself does not seem to adopt either view.

While the ALJ, the NLRB, and this court are aided by sworn testimony of Mr. Dennison, his clients of the bargaining unit, and documents produced by them, as to the course of negotiations, Mr. Dick has disappeared from the scene, both he and whatever notes and files he might have kept. It seems his position became surplus on Manor Care becoming the parent company, and he left his employment in May 1982, before the instant controversy arose. No one knew how or where to reach him at the time of trial. No inference from his unavailability was drawn for or against any party to the case.

The parties went through most of 1982 unaware of the hazard to their harmonious relations the sick leave issue would pose. Patricia Shepherd, Manor Care's new administrator for the Decatur facility, had been employed there previously but had had no connection with the contract negotiations. Apparently having been asked to set up the buy-back procedures, she examined the contract and could find nothing in it about sick leave. So she telephoned James F. McCormick, Regional Director for Manor Care, who had sixteen health care facilities under his supervision, including the one at Decatur. He could find nothing in his copy either. They agreed they were not obliged to make any provision for sick leave and in the future would not do so, but to discontinue it after employer had been granting it all year, just before Christmas, would be unwise. Thus, a notice was posted that the buy-back would be conducted as usual, but not on account of any company obligation. While the writing thus was on the wall, the employees were positively told

there would be no sick leave or buy-back for 1983 only on March 9. Mr. Dennison had before then heard rumors, read the contract, and confirmed the painful truth. He attempted to have the issue referred to arbitration, but the employer refused, presumably on the ground the claim did not arise out of the contract, which includes an arbitration clause. Mr. Dennison was told if he didn't like it, his recourse was an unfair labor practice complaint, and one promptly followed.

With respect to nonbargaining unit employees at the Decatur facility, the policy of allowing sick leave and paying the "buyback" continued unaltered to the time of trial.

## Discussion

### I

■ The NLRB found that the parties to the contract agreed to continue the sick leave benefits according to previous practice, and that by "mutual mistake" they omitted a clause so providing from their contract. We think both parts of this have ample support of "substantial evidence on the record considered as a whole * * *." 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). In the standards there set out, the evidence is more than a mere scintilla, and is such as a reasonable mind might accept as adequate to support a conclusion. The ALJ's own assessment is entitled to weight, especially so far as to reach it, he had to make credibility determinations.

It hardly would be possible to find the parties did not agree as to sick leave benefits. Documentary evidence adduced by the NLRB, and originally created during the negotiations, shows that the union had made a claim for improved sick leave benefits, but acquiesced when the employer refused, and stated it would settle for what the bargaining unit employees already had. The employer reiterated continuously from beginning to end that it would continue them in effect. Thus all difference between the negotiating positions had vanished, and they were agreed. Only a little closer is the question whether they intended to make an oral side agreement outside the contract, or to put it in the contract. That the truth was the latter has support only beginning with Mr. Dennison's testimony. The contract, as signed, under Article XVIII, On-the-Job Injury, Section 3, has a clause "[n]o charge will be made against *accrued sick leave* for on-the-job injuries unless said injuries result in an absence from work of no more than three (3) days. * * *" [Emphasis supplied.] This is meaningless if the union has not contracted for a right to accrued sick leave and obviously was written in the expectation such leave would be provided for. The "zipper" clause, Article XXVIII, makes it folly to rely on an outside oral agreement, as both negotiators cannot but have understood. The contention or suggestion by respondent that they ever so intended pays scant tribute to their intelligence. Mr. Dick did at one time talk as if he meant to leave out an agreement calling for annual free uniforms, but in the end he added it to an appendix to the contract, after all, showing he understood the situation perfectly. As Mr. Dick prepared the final draft, of course he might have meant to overreach the union negotiators, but respondent does not suggest this for obvious reasons, and indeed, there is nothing in the record to suggest he did not negotiate in entire good faith. Thus, mutual inadvertence and mistake are, on the whole record, a far more plausible explanation of the absence of a contract clause dealing with sick leave than is a conscious choice to leave it out and make the agreement actually reached a legal nullity.

### II

There cannot be any doubt that in the absence of specific findings that an agreement respecting sick leave was made, and was omitted from the written contract by inadvertence and mistake, the "zipper" clause would be perfectly effective to legalize the action of the employer in stopping payment of sick leave benefits without no-

tice to the union or negotiation with it. *Aeronca, Inc. v. NLRB,* 650 F.2d 501 (4th Cir.1981); *NLRB v. Auto Crane Co.,* 536 F.2d 310 (10th Cir.1976). The General Counsel does not argue otherwise. Therefore, the specific question for our decision is, what difference do the inadvertence and mistake make?

■ We are not aided as much as we might have wished by the several pronouncements of the NLRB, the General Counsel, and the ALJ, as to what law they rely on. However, the Act, 29 U.S.C. § 158(d), does require an employer "to execute a written contract incorporating any agreement reached." Court orders requiring such agreements to be put in writing are common, *e.g., Retail Clerks International Association v. NLRB,* 373 F.2d 655, 659 (D.C.Cir.1967). Assuming, as we now do, that an agreement was reached, reliance on the "zipper" clause to excuse the employer from putting in writing, as the NLRB has ordered, an agreement actually reached, does frustrate the policy of the Act. It would have been in writing but for inadvertence and mistake. If the oral agreement also incorporated a term that it was a "gentleman's agreement" that should not be put in writing, that would be a different case with which we are not confronted. Here we have a contract negotiated under the actual order of this court, and it incorporates a clause asserted to nullify a basic policy of the Act we were trying to enforce. We think, in the circumstances, the "zipper" clause must be read with an implied exception that it has no application to an actual agreement negotiated pursuant to court order, but omitted from the written contract by inadvertence and mistake. It is often asserted that good technical contract law is not necessarily good collective bargaining law. *San Antonio Machine & Supply Corp. v. NLRB,* 363 F.2d 633, 636 (5th Cir.1966); *Lozana Enterprises v. NLRB,* 327 F.2d 814, 818 (9th Cir.1964). Our reading of the "zipper" clause leaves it ample scope for application, where it will not nullify statutory policy.

## III

■ Finally, the employer invokes the law of equity, saying that the NLRB's reformation of the contract was improper in view of the facts establishing waiver and estoppel on the union's part.

It is true that reformation of the plain language (or here, eloquent silence) of a contract and enforcement of it as reformed, was before the merger of law and equity, an equitable remedy, available only in a tribunal having equity jurisdiction. *South Boston Iron Works v. United States,* 34 Ct.Cl. 174, 200 (1899). Even in more recent times entities have been created which could enforce contracts as written but not reform them, for example, until very recently, contract appeal boards. *Applied Devices Corp. v. United States,* 591 F.2d 635, 219 Ct.Cl. 109 (1979). No one questions the right of the NLRB to exercise this jurisdiction, though it must petition this court for enforcement and cannot do so itself. It is seeking relief under the law of equity and thus opens itself to questioning as to whether it is doing equity as well. When a federal court is asked for injunctive or other prospective relief, " * * * the standards of the public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief in these cases." *Hecht Co. v. Bowles,* 321 U.S. 321, 331, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). We think respondent, in its complaint about the negligence of Mr. Dennison and the union generally in not reading the contract they signed, and in reacting too slowly to the employer's stand on the sick pay issue when revealed, is relying too much on the inadequacies of what is after all only the "charging party" and is not considering enough the public interest in labor peace. But even if the union were a plaintiff in a civil suit, its negligence would not bar reformation and enforcement of the contract as reformed. *Applied Devices Corp. v. United States, supra.* If parties to contracts were never negligent, courts would never need to reform them.

■ This concludes our review except for one relatively minor matter. The post-

ed notices which the NLRB customarily requires amount to an avowal that the employer has, figuratively speaking, stopped beating his wife. That is, he is required to use phrases that in one breath confess past derelictions and promise future reform. This may be perfectly all right in the typical case, but we think it is inappropriate in one such as this where equitable reformation of contract language is required. The fresh-caught officers of the employer, with no knowledge of the negotiations, and only the bald text of the contract to guide them, justifiably believed from everything known to them that they had a perfect right to terminate the sick leave benefits, a right guaranteed to them by Article XXVIII, the "Zipper" clause. The officials of the union had said or done nothing to alert them that the benefits were claimed under the contract. When employer's officers first learned of the claims, the right and wrong were so uncertain as to require an evidentiary hearing before being established.

Justice Douglas' landmark opinion in *Hecht Co. v. Bowles* also points out that statutory injunctive enforcement language never should or can be construed, unless compelling, to require courts to order remedies not acceptable to the mild and measured conscience of the equity tribunal.

The NLRB here would require the employer to declare in a posted notice to employees:

> [T]he National Labor Relations Board has found that we have violated the National Labor Relations Act, as amended, and has ordered us to post this notice. We will not terminate the sick leave program to which we have agreed, and we will not deny our employees the sick leave benefits to which they are entitled. We will not in any other like or related manner interfere with, restrain, or coerce employees in the exercise of rights guaranteed in Section 7 of the Act.

And we have stopped beating our wives! The implications of this notice are untrue because the employer has not yet violated the Act and will not do so unless and until the mandate of this court has issued and

the employer then refuses to do what we will grant enforcement to require it to do. Americana has not agreed to the sick leave benefits in a manner to obligate it, and will do so only when it amends the contract as ordered. At present, the contract is unamended and has no provision for sick leave.

The remainder of the proposed notice is proper and is ordered.

ENFORCEMENT GRANTED AS SPECIFIED.