**BARROW UTILITIES & ELECTRIC COOPERATIVE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 725–85C.**

United States Claims Court.

April 6, 1990.

As Amended April 9, 1990.

Gerard R. LaParle, Fairbanks, Alaska, for plaintiff.

Steven A. Hemmat, Washington D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Roger L. Hudson, Office of the Regional Sol., Alaska Region, Dept. of the Interior, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for summary judgment and calls for resolution of the issue whether the Government was obligated to fund major repair projects for a utility operated by a cooperative for the benefit of a predominantly Eskimo community.

## FACTS

The following material facts are undisputed. Plaintiff Barrow Utilities and Electric Cooperative, Inc. (formerly Barrow Utilities, Inc.) ("plaintiff"), is the sole provider of utility service to Barrow, Alaska. Barrow, Alaska is a predominately Eskimo community on the shores of the Arctic Ocean. The temperatures in Barrow are so cold that layers of permafrost on the surrounding terrain thaw, upon average, only one or two feet per year. Given the climatic conditions, the supply of water, heat, and electricity is of continuing concern to the residents of Barrow.

In November 1974 plaintiff and the Department of the Interior's Bureau of Indian Affairs (the "BIA") entered into contract No. E00C142001145 ("contract No. 1145") to terminate on June 30, 1975. The incrementally funded contract to continue in effect from year to year provided that plain-

tiff would operate and maintain the utility system in Barrow. Further, a schedule to the agreement provided that the BIA would fund 12 "major repair" projects to the utility system, at an estimated cost of $145,450.00. Major repairs were defined in the contract as

> those which can be planned on a one-time basis at intervals of one year or more. Major repair is the restoration of Plant Facilities or equipment to a condition substantially equivalent to its original status or design capacity and efficiency by replacement, minor alterations or minor improvements, except as defined in "Service Work." Major repairs include such items as replacing and reinforcing damaged structural members, minor remodeling of buildings, replacement of damaged sections of water lines, sewer lines, steam lines, fuel lines, electrical systems, etc. Emergency replacement of a major nature would be considered a "major [repair]." One example of an emergency repair would be the replacement of an entire roof which has been badly damaged by the wind....

The contract provided that funds for major repairs were subject to the availability of appropriations. It also required a written modification signed by the contracting officer before the BIA would be liable for costs beyond the estimates for the major repairs identified in the contract schedule. Similarly, plaintiff was not obligated to continue performance under the contract or to incur costs beyond those in the contract schedule, unless the contracting officer notified plaintiff in writing that the contract costs had been increased.

On September 10, 1975, the BIA entered into a Tri–Party Agreement with plaintiff and the North Slope Borough of Alaska (the "Borough"). The agreement provided that debts accumulated by plaintiff in favor of the BIA would be voluntarily foreclosed upon. Pursuant to the agreement, plaintiff would transfer the entire "distribution system owned by [plaintiff], except permits and certificates of public necessity," and the BIA would assume full ownership of the utility. As owner, the BIA agreed to undertake a program of upgrading the gas distribution system so as to bring it into compliance with federal safety standards. Thereafter, the BIA would transfer the entire system to the Borough, which would contract with plaintiff. As an "an essential part" of the agreement, plaintiff was to be retained to maintain the utility and to provide utility services to customers residing in and around Barrow. To that end the agreement stipulated that the BIA and plaintiff enter into an operating agreement—contract No. 1145—before the BIA assumed ownership of the system. In November 1975, by modification No. 7, contract No. 1145 was renewed for fiscal year 1976. Modification No. 7 also deleted BIA funding for operations and maintenance and put into effect a new major repairs schedule listing nine major repairs estimated to cost $281,500.00. The modification further provided that, in order to minimize BIA costs, plaintiff would succeed to the BIA's operations and maintenance responsibilities in exchange for the right to sell all utilities produced and that "[t]he Bureau will fund *'MAJOR REPAIR PROJECTS,'* as mutually agreed to, subject to the *'Availability of Bureau Funds,'* until such time as the property passes out of the Bureau ownership." Modification No. 9 extended contract No. 1145 through September 1976, obligating an additional $107,-000.00 for two more major repair projects. Modification No. 10 on December 16, 1976, extended contract No. 1145 through March 31, 1977, and provided $90,000.00 in additional funding representing the estimated cost of repairs to the main gas line. Modification No. 11 effective on February 1, 1977, extended the contract until September 30, 1977, limiting the continuation to major repair projects in progress.

Plaintiff and the BIA executed a successor contract No. E0014201396 ("contract No. 1396") on February 8, 1977. Under the successor agreement, the BIA also agreed to fund major repairs projects, as mutually agreed to between the parties, subject to the availability of funds. The successor contract had the effect of superseding the earlier contract, No. 1145, except as to those major repair projects still under way

at the time contract No. 1396 was signed. Contract No. 1396 did not contain a schedule of authorized repairs. Ostensibly, the BIA's plan was to have contract No. 1396 serve as a supervening agreement and to execute new and separate contracts for each major repair project agreed to by the parties. By executing distinct contracts for new work, instead of modifications to the original agreement, the contract administrator expressed the hope to "keep a better control" over the relationship and to avoid potential confusion in the BIA's and plaintiff's agreement.

After the effective date of contract No. 1396, no funds were forthcoming from the BIA for new repair projects. The BIA completed eight of the 12 major repair projects identified in the schedule to contract No. 1145. By modification No. 12 to contract No. 1145, the BIA did approve $50,000.00 of additional spending for completion of a previously authorized project. The modification committed "supplemental funding" to complete installation of a reverse osmosis water treatment plant and related equipment at the utility.

On October 4, 1977, plaintiff wrote the BIA requesting funds for repair and overhaul work on two gas turbine engines and three diesel engines. It was feared that if the utility's principal gas turbine, the 2500 KW Solar Centaur, were to break down, the other gas and diesel turbines on site would be unable to provide sufficient power to the community. Plaintiff's General Manager Frankland Smith stated:

It is not difficult to realize the consequences of a failure of the Centaur gas turbine. Only one 750 KW gas turbine and the 250 KW diesel engine are available for service. Even at full load, these two machines cannot meet the peak loads which are being experienced daily. We cannot even take a planned outage on the Centaur turbine for the remainder of the winter. If a failure of the Centaur gas turbine results in a lengthy outage, it will be necessary to operate on a load transfer basis whereby the town would be sectionalized, each section receiving in turn for short periods of time whatever power is available. . . .

Following an inspection of "utility production and distribution facilities" by BIA officials, a report listing the cost of major repairs was issued by the inspection team. The team's May 16, 1979 recommendation for major repair work totaled $680,500.00. To date, plaintiff has received no funding from the BIA for the repair projects identified in the report.

By letter dated November 10, 1977, the BIA's Acting Area Director responded to Mr. Smith's letter:

I do not have funds available for this purpose and have no Bureau program in Barrow to justify seeking funds. The Bureau does not have public utility responsibilities to warrant our receiving such funds. Only while we had to support a Bureau educational program in Barrow could we secure funds for utilities support and with the cessation of that program all previous repair and maintenance funds have been withdrawn.

. . . .

Overhauls of electrical generating equipment should be regularly anticipated and provided for out of routine maintenance and repair allowances in your budget. If it is not, you are not following general practices of a utility company.

By letter dated September 4, 1985, plaintiff's counsel forwarded to the BIA plaintiff's certified claim under contract No. 1145 for $281,378.00, representing monies plaintiff claimed that it had expended in performing the remaining major repairs called for by contract No. 1145. The contracting officer disallowed all but $79,139.00—which he noted "might be payable upon proper billing for these authorized projects." As to the remainder, the contracting officer made two findings: Three of the seven projects covered by the claim constituted work that was never authorized under contract No. 1145; claims as to the other four projects represented unauthorized cost overruns on approved work. As to these four projects, the parties agree that the projects were funded up to the estimates, so that plaintiff seeks the

amount required to fund them to completion. The contracting officer concluded that the BIA was not contractually liable for any of the sums claimed.[1]

In its suit filed on December 11, 1985, plaintiff sought $281,378.00 for the rebuilding of three generators and the water production unit, completion of utility's underground pipeline, and installation of a water clarifier tank. The case was transferred to this judge on July 31, 1989. In their Joint Preliminary Status Report filed on May 9, 1986, defendant proposed filing a dispositive motion; the parties commenced briefing in November 1989.

## DISCUSSION

The Anti–Deficiency Act, 31 U.S.C. § 1341(a)(1) (1982), provides, in pertinent part, that the Federal Government, may not, through its officers or employees,

(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or

(B) involve the [United States Government] in a contract or obligation for the payment of money before an appropriation is made unless authorized by law.

Paragraph 201 of contract No. 1145 provided, in pertinent part: "This contract is subject to the availability of appropriations." Part 116.00 "Major Repair" provided:

116.01 It shall be the Contractors responsibility during operation and through inspections to note the equipment condition. When deteriorating equipment conditions are found, the Contractor shall identify, document, prepare recommendations for major repair, and forward them to the Fairbanks Agency—Superintendent who is the COR [Contracting Officer's Representative] under this contract. The Contractor will be informed of the

work planned and the status of the work during scheduled meetings.

116.02 The Bureau will determine how major repairs will be accomplished. Should the Contractor be determined to have necessary capabilities for accomplishment of the project, it may be included through modification as a part of this contract.

Paragraph 203.01 "Consideration and Method of Payment" provided:

This is a Cost–Reimbursable contract which provides payment to the Contractor for actual costs incurred in the performance of the contract. The total estimated cost is the amount stated in the contract, or any amendment of that amount [that] may be made and which is shown in greater detail in the Budget documents, Exhibit A attached.

Paragraph 302 "Changes" C. read:

Notwithstanding the provisions of paragraphs (A) and (B), above, the estimated cost of this contract and, if this contract is incrementally funded, the funds allotted for the performance thereof, shall not be increased or deemed to be increased except by specific written modification of the contract indicating the new contract estimated cost and, if this contract is incrementally funded, the new amount allotted to the contract. Until such modification is made, the Contractor shall not be obligated to continue performance or incur costs beyond the point established in the clause of this contract entitled "Limitation of Cost" or "Limitation of Funds."

Paragraph 303 "Limitation of Cost" provided, in full:

A. It is estimated that the total cost to the Government for the performance of this contract, exclusive of any fee, will not exceed the estimated cost set forth in the Schedule, and the Contractor agrees to use his best efforts to perform the work specified in the

---

**1.** Having submitted a certified claim on August 29, 1985, plaintiff sued under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982 & Supp. III 1985) (the "CDA"). Senior Judge Lydon ruled in *Busby School of Northern Cheyenne Tribe v. United States,* 8 Cl.Ct. 596, 600 (1985), that a claim against the BIA for failure to fund school repairs sought relief on a "basically grant or sociological type" contract, was not a procurement contract, and could not be maintained under the CDA. This court agrees. Jurisdiction is present under 28 U.S.C. § 1491(a)(1) (1982).

Schedule and all obligations under this contract within such estimated cost. If, at any time, the Contractor has reason to believe that the costs which he expects to incur in the performance of this contract in the next succeeding 60 days, when added to all costs previously incurred, will exceed 75 percent of the estimated cost then set forth in the Schedule, or if, at any time, the Contractor has reason to believe that the total cost to the Government for the performance of this contract, exclusive of any fee, will be greater or substantially less than the estimated cost hereof, the Contractor shall notify the Contracting Officer in writing to that effect, giving the revised [estimate] of such total cost for the performance of this contract.

B. Except as required by the other provisions of this contract specifically citing and stated to be an exception from this clause, the Government shall not be obligated to reimburse the Contractor for costs incurred in excess of the estimated cost set forth in the Schedule, and the Contractor shall not be obligated to continue performance under the contract (including action under the Termination clause) or otherwise to incur costs in excess of the estimated cost set forth in the Schedule, unless and until the Contracting Officer shall have notified the Contractor in writing that such estimated cost has been increased and shall have specified in such notice a revised estimated cost which shall thereupon constitute the estimated cost of performance of this contract. No notice, communication, or representation in any other form or from any person other than the Contracting Officer shall affect the estimated cost of this contract. In the absence of the specified notice, the Government shall not be obligated to reimburse the Contractor for any costs in excess of the estimated cost set forth in the Schedule, whether those excess costs were incurred during the course of the contract or as a result of

termination. When and to the extent that the estimated cost set forth in the Schedule has been increased, any costs incurred by the Contractor in excess of the estimated cost prior to such increase shall be allowable to the same extent as if such costs had been incurred after the increase; unless the Contracting Officer issues a termination or other notice and directs that the increase is solely for the purpose of covering termination or other specified expenses.

C. Change orders issued pursuant to the Changes clause of this contract shall not be considered an authorization to the Contractor to exceed the estimated cost set forth in the Schedule in the absence of a statement in the change order, or other contract modification, increasing the estimated cost.

D. In the event that this contract is terminated or the estimated cost not increased, the Government and the Contractor shall negotiate an equitable distribution of all property produced or purchased under the contract based upon the share of costs incurred by each.

The language of contract No. 1145 thus restricted the BIA's obligation to fund the identified major repairs to monies appropriated for this purpose; limited the BIA's obligation on any repairs to the estimate therefor, unless a modification issued; limited the BIA's obligation to reimburse plaintiff for costs incurred in excess of the scheduled estimates; provided that the parties would divide the property to the extent either incurred costs above the estimates; and did not obligate the BIA to fund any additional repairs recommended by plaintiff.

■ Contract No. 1396 contemplated that a separate cost-reimbursable contract would be executed for each project agreed to by the parties subject to the availability of funds. The terms of this contract created no residual obligation to fund projects under contract No. 1145.[2]

---

**2.** The result would be the same even if funds

had been appropriated by Congress and agency

■ In its motion for summary judgment, plaintiff asserts that both the BIA and it had an "obligation to provide an entire community with all of its utilities." Plf's Br. filed Dec. 26, 1989, at 33. Further, because Barrow, Alaska, had no alternative source of utility services, plaintiff argues that the BIA cannot abandon its responsibilities under contract No. 1145 to fund major repairs. Plaintiff argues: "Ignoring mandatory repair work or shutting down equipment replacement projects was not an alternative because such would have inevitably resulted in a shutdown of electricity, natural gas, water and/or sewage removal to an entire community...." *Id.* at 30. While the consequences of a utility shutdown would have been dire for the residents of Barrow, the court cannot derive from this circumstance a continuing, open-ended obligation for the BIA to fund maintenance and repair projects at the utility, other than those enumerated in the contract consistent with the estimates therein. The Government cannot enter into fluid and unlimited obligations, and to allow such a result would be contrary to law. Plaintiff's claims must, therefore, be rejected. The BIA cannot be held liable for sums spent on utility repairs by virtue of the fact that the money was needed and was spent wisely.

■ Arguing that it is entitled to an equitable adjustment to its contract(s) with the BIA, plaintiff cites *S.A. Healy Co. v. United States*, 216 Ct.Cl. 172, 576 F.2d 299 (1978), and *C.H. Leavell & Co. v. United States*, 208 Ct.Cl. 776, 530 F.2d 878 (1976) (per curiam). In *S.A. Healy Co.*, plaintiff sought an equitable adjustment on its construction contract with the Government. Continued performance under the contract was contingent upon the availability of funds. The agreement provided that the contracting officer would notify the contractor if funds were available for work in the coming fiscal year. Under the contract "the contractor [had] the choice of continuing performance while awaiting the availability of additional funds, or suspending performance until additional funds [were] forthcoming...." 216 Ct.Cl. at 177, 576 F.2d at 301. When funds were exhausted, plaintiff suspended part of its operations. Weeks later, when a supplemental appropriation from Congress made funds again available for contract work, the contractor sustained significant costs in remobilizing its work force. The Court of Claims held that while the contractor did assume some risk of losses due to remobilization after a shutdown, the contractor did not assume that the shutdown would be occasioned by the agency's inadequate budget requests. *Id.* at 185, 576 F.2d at 305. In *S.A. Healy* the damage suffered by the contractor was not the result of the Government's ending its support for a particular program; rather, the losses were sustained because the agency's inadequate funding requests required the contractor to disperse its force only to reconvene it for work 160 days later. *S.A. Healy* does not support plaintiff's request for an equitable adjustment. The BIA's budgeting practices never resulted in losses to the utility because work on approved projects was stopped and then started again. Moreover, contract No. 1145 in the case at bar expressly required that a modification be issued for any increased funding.

In *C.H. Leavell & Co.*, Congress trimmed the agency's budget request, and the agency was forced to prioritize allocation of limited funds. Although the Court of Claims found that the agency acted reasonably in dispersing scarce resources among different contracts, the court held that

officials decided not to expend monies on the repair projects. In *Leiter v. United States*, 271 U.S. 204, 207, 46 S.Ct. 477, 478, 70 L.Ed. 906 (1926), the Supreme Court held that the Government was not obligated to perform in the succeeding years of a multi-year lease, despite the fact that funds for rental of the property had been appropriated. To bind the Government to perform beyond one year, "it is necessary, not only that an appropriation be made available for the payment of rent, but that the government by its duly authorized officer, affirmatively continue the lease for such subsequent year...." *Accord Government Sys. Advisors, Inc. v. United States*, 847 F.2d 811, 813 (Fed.Cir. 1988) (agency not obligated to renew contract for under-utilized computer hardware, software, and related services where funds were available).

plaintiff was entitled to an equitable adjustment for costs associated with returning to work after six and one-half months of suspended work. 208 Ct.Cl. at 780–81, 530 F.2d at 879–80. The court adopted the trial commissioner's reasoning that the purpose of the equitable adjustment was to compensate the contractor for costs incurred while in "stand-by status"— an interim position, between work on funded projects, that was of benefit to the Government:

> Such a suspension is clearly designed to keep the contractor available for a period of time after exhaustion of funds while the contracting agency awaits either additional funding from the Congress or from discretionary allocations of appropriated funds within its own organization. In these situations, when funding again becomes available, the Government is spared the expense, delay and inconvenience incident to reletting the contract. Surely the government should expect to pay for this extra contract right by reimbursing the contractor for additional costs incurred while in stand-by status unless through clear and specific language that risk is allocated to the contractor alone.

*Id.* at 803, 530 F.2d at 893. Since the BIA did not request plaintiff in this case to resume work upon projects for which funding was ended, *C.H. Leavell* is unavailing. The contracts in both these cases contained suspension of work clauses that provided for relief under the circumstances that occurred. Plaintiff's contracts with the BIA did not contain this clause.

Assuming that relief under the contract(s) were available, plaintiff does not persuade that an equitable adjustment would be an appropriate remedy in this case. In *Bruce Construction Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516 (1963), the Court of Claims observed:

> Equitable adjustments in this context are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract. Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification, it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification....

163 Ct.Cl. at 100, 324 F.2d at 518; *see Nager Elec. Co. v. United States*, 194 Ct.Cl. 835, 851, 442 F.2d 936, 945 (1971) (measure of an equitable adjustment is the reasonable costs resulting from a change order). In this case, however, there is no evidence that any government order, direction, or modification resulted in the alteration of plaintiff's position. The BIA chose to not fund additional repairs at the utility, and its decision to end funding, without more, does not trigger a change.

Even under the doctrine of constructive changes, plaintiff must show that the additional work it performed was not volunteered and was ordered by a government officer having the requisite authority. *Calfon Constr. Inc. v. United States*, 18 Cl.Ct. 426, 434, *appeal docketed*, No. 90–5033 (Fed.Cir. Dec. 12, 1989). Plaintiff has not made this showing.

■ Plaintiff's reliance on *Applied Devices Corp. v. United States*, 219 Ct.Cl. 109, 591 F.2d 635 (1979), does not lend support. In that case plaintiff, an electronics firm, bid to supply radar systems in a three-step multi-year procurement. The award of the contract obligated funds for the first program year. If funds were not appropriated for additional years, the contractor was due a cancellation charge, as provided for under the contract and regulations. The contracting officer did not request funds for the 1970 installment of the contract because plaintiff's equipment was no longer required. While the Court of Claims would not disturb the contracting officer's determination that plaintiff's equipment was no longer a Navy requirement, it did agree with plaintiff that it was entitled to reformation of the contract. The court so held based on the finding that the contracting agency had not correctly computed the ceiling to be placed upon the

cancellation charges due the contractor. In this case, neither the contract provisions nor applicable regulations accorded plaintiff any sums if additional funding was not forthcoming. The basis for recovery in *Applied Devices* cannot be sustained upon the facts in this case.[3]

■ Defendant argues that plaintiff's claim should be barred by the equitable doctrine of laches. The Court of Claims and the Federal Circuit have recognized the doctrine of laches in contract cases, *S.E.R., Jobs for Progress, Inc. v. United States,* 759 F.2d 1, 5–6 (Fed.Cir.1985); *Eggers & Higgins v. United States,* 185 Ct.Cl. 765, 403 F.2d 225 (1968) (per curiam), *but see Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1392 (Fed.Cir.1987), and this court has deemed it applicable to the period between accrual of a claim under the CDA and its submission to the contracting officer. *La Coste v. United States,* 9 Cl.Ct. 313, 315–16 (1986) (citing cases).[4]

The defense of laches, in the context of government contract cases, requires proof of lack of diligence by the party against which the defense is asserted and prejudice to the party asserting the defense. *S.E.R., Jobs for Progress,* 759 F.2d at 5. Plaintiff's counsel argued that its delay was the product of a calculated strategy informally to negotiate, rather than to formalize its claim. The record reveals that this tactic bore no fruit and was pressed too long.

The last of the major repair projects for which plaintiff seeks recompense, rebuilding the Aqua Chem water unit, was completed in May 1980. Only in February 1983 did plaintiff first identify the specific amounts it was claiming as refundable

from the BIA, and plaintiff did not request a final decision of the contracting officer until June 19, 1985. In the interim, between completion of the Aqua Chem unit and submission of a claim to the contracting officer, an office fire in June 1981 resulted in a "significant loss of office records," Plf's Br. filed Feb. 21, 1990, at 8, including invoices substantiating the costs incurred by plaintiff in performing the repairs. In June 1987 plaintiff provided the BIA with computer printout sheets summarizing its accounting records. Absent the lost invoices, the BIA cannot verify plaintiff's claim and has been prejudiced by plaintiff's delay in submitting its claim. Plaintiff's claim is barred by the doctrine of laches.

## CONCLUSION

Accordingly, based on the foregoing, defendant's cross-motion for summary judgment is granted, and plaintiff's motion is denied. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

---

**3.** Plaintiff's contention that it justifiably relied upon government conduct and that defendant should be equitably estopped to deny its claim is without merit. Plaintiff cannot substantiate that it reasonably relied on the BIA's undertaking to fund major repairs beyond the scheduled repairs or estimates for them, because contract No. 1145 specifically required all such commitments to be evidenced by modifications. Similarly, plaintiff has failed to make a showing in support of its motion for summary judgment that a course of dealing was established whereby plaintiff received oral authorization to undertake major repairs, followed months later by the requisite modifications. Plaintiff's claim of

unjust enrichment is undercut by the provision in contract No. 1145 allocating an equitable distribution of all property upon contract termination based upon the share of costs incurred by each party. Plaintiff's claim based on the implied covenant of good faith and fair dealing is subsumed in the discussion of *C.H. Leavell* and *S.A. Healy.* Finally, the discussion of *Applied Devices* adequately covers plaintiff's claim for reformation.

**4.** *See supra* note 1. Since the parties treated the case as filed under the CDA, the discussion is framed accordingly.