### SOUTHWEST WELDING & MANUFAC-TURING COMPANY

v.

### The UNITED STATES.

No. 343–60.

United States Court of Claims.
March 17, 1967.

David V. Anthony, Washington, D. C., for plaintiff, Eldon H. Crowell, Washington, D. C., attorney of record. Thomas H. Carver, Trippet, Yoakum & Ballantyne, Los Angeles, Cal., John M. Allen and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

DAVIS, Judge.

In June 1953, plaintiff, a metal fabricator, contracted with the Corps of Engineers to furnish all labor and materials for the construction and installation of three welded steel penstocks and six welded steel surge tanks for the Garrison Dam and Reservoir Project near River-

dale, North Dakota, at an original contract price of $6,624,762. Penstocks are large steel sluices, approximately 1,600 feet long and twenty-four feet in diameter, which convey water from the dam to the powerhouse. Surge tanks, connected to each end of a penstock, absorb and regulate sudden fluctuations in water flow.

Plaintiff has asserted four claims for relief arising out of its dealings with the United States, three of which are now before the court on cross-motions for judgment. Each of the claims was denied by the contracting officer and the Corps of Engineers Claims and Appeals Board. Since the Board's determinations in 1956 and 1957, however, the administrative records on the appeals have been disassembled or misplaced. In the absence of the certified records, the parties have stipulated as to their contents, at least in part. The stipulation refers to the basic written materials submitted by the parties and relied upon by the contracting officer and the reviewing board.[1] Since administrative hearings were neither requested nor held, there is no transcript of oral testimony.

■ We are not necessarily precluded from disposing of any or all of the claims because of the absence of an official administrative record. It is agreed that the stipulated record includes all the documents the parties themselves presented to the Board. If the latter considered anything else, it was without the litigants' knowledge. To determine whether to stay our proceedings pending further administrative action or to grant, in whole or in part, one or the other of the motions for summary judgment, we must ask, with respect to each claim, whether we have all the information, from the parties' submissions, necessary to render a proper judgment. C. J. Langenfelder & Son v. United States, 341 F.2d 600, 606, 169 Ct.Cl. 465, 475–476 (1965). Cf. United States v. Carlo Bianchi & Co., 373 U.S. 709, 717–718, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 428, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966). If this condition is met, we can adjudicate the issue at this time and proceed to judgment. We think that such information is available for claims one and three; resolution of claim two will have to await further stipulation by the parties or renewed action before the administrative tribunal.

*Count I:* Plaintiff was required to weld each of the penstocks to steel connecting rings, twenty-nine feet in diameter, which had been built and installed in concrete tunnels by another contractor. Since each penstock was only twenty-four feet in diameter, the end sections of the penstocks flared out in the shape of a cone. When attempts were made to connect the cone portions of the penstocks to the connecting rings, the structures did not align precisely. While the diametrical dimensions were correct, the plane of the connecting rings was not perfectly perpendicular to the longitudinal axis (centerline) of the tunnel. Since the penstocks were constructed to align with rings installed on a plane of perfect perpendicularity, plaintiff encountered a gap between the penstock and the connecting ring—the widest point of which was $7/8$ of an inch at the top centerline.[2]

1. The materials comprising the stipulated record include: the decisions of the contracting officer and the Corps of Engineers Claims and Appeals Board, the contracting officer's findings of fact for each of the three claims, the parties' legal memoranda submitted during the administrative hearings, portions of the contract specifications, and correspondence between the parties.

The stipulation also states: "No other documents are known by either of the parties to have been part of the administrative records in the above designated appeals. * * *

"Plaintiff states it does not agree that the reconstructed records constitute the actual records before the Board for the reasons that it has no way of knowing what documents or other matters, if any, the Board may have considered in addition to those presented by the parties."

2. Plaintiff alleged that at the time of initial fit-up there was a gap of approxi-

The contracting officer considered this gap too large to be corrected by plaintiff's proposed welding procedure and required the contractor to refit the penstocks and align them with the connecting rings. After unsuccessfully pursuing its administrative remedies, plaintiff now seeks an equitable adjustment of $45,192.47 for the additional work entailed in adjusting the penstocks more closely to the rings.

The project drawings incorporated in the contract specified that the connecting rings would be located at station "143+71.5±" along the centerline of the tunnel and that the plane of the rings would be at an angle of "90°±" to the centerline of the tunnel. The question, therefore, is whether the deviation of ⅞ of an inch from perfect perpendicularity was contemplated by the plus and minus language of the contract.

■ Interpretation of contractual terms is ultimately a question of law, and we are required to examine *de novo* the holding of the administrative body. 41 U.S.C. § 322 (1964); Kaiser Indus. Corp. v. United States, 340 F.2d 322, 333–334, 169 Ct.Cl. 310, 331 (1965). Since finality does not attach to the Board's decision on this issue, we need not be concerned with any unknown lacunae in the stipulated record, omitting materials which may possibly have influenced the Board. Moreover, the physical facts relevant to this claim are not in dispute. Disagreement centers on the meaning of the contractual term "90°±" and the legal effect to be given to a misalignment of the connecting rings of ⅞ of an inch.

The use of plus and minus symbols following the base number "90°" indicates that the base number is an approximation. These symbols connote that a variance from the 90° would be permissible under the contract as long as the

mately one inch at the top centerline, a gap of approximately ½ inch on the east and west sides at the horizontal centerline, and a gap of approximately ⅛ of an inch at the bottom centerline. If the penstock section were brought right up to the ring at the bottom centerline, the maxi-

deviation is relatively slight or insubstantial. Determination of whether a deviation is slight or insubstantial is not to be made in a vacuum. It compares the magnitude of the deviation with that of the base number within the factual context of the particular case.

■ The Claims and Appeals Board computed that the lateral error of ⅞ of an inch resulted in a maximum angular error of 0°8′38″ (less than ⅐ of one degree) or a 0.16% deviation from the base number of 90°. The rings were positioned on an axis of approximately 89⅞° and 90½°. The extent of this deflection, considered against the size and weight of the rings and the relatively poor foundation upon which the rings and the tunnel rested, cannot be considered significant, substantial, or impermissible. We think that for this project such a deviation was within the variation contemplated by the use of the figure "90°±". If greater accuracy were to be required, the parties could either have dispensed with the plus and minus symbols or calculated the base number in terms of minutes as well as degrees.

This contract did not require greater precision from the Government or the prior contractor. The terms of the agreement and the nature of the project should have alerted Southwest Welding, an experienced contractor, to the real possibility that successful completion of its job would call upon it to include fabrication allowances which would expedite the making of any necessary field adjustments. As we have stressed, the stationing, as well as the angle of the plane, of the connecting rings were qualified on the contract drawings by plus and minus symbols. The relevant figures were given in degrees, and not broken down more minutely. The specifications specifically recognized that field adjustments might well be required:

mum gap between the structures would have been ⅞ of an inch. The contracting officer and the Claims and Appeals Board premised their decisions on a maximum deviation of ⅞ of an inch. We also accept this as the extent of the gap.

"Due to changes in dimensions and elevations as a result of settlement and rebound of structures which has occurred since they were constructed, the Contractor shall detail the work in such a manner that field adjustments can be made to accommodate the conditions existing at the time of erection." [¶ 4.02b]

Whether or not this provision is directly applicable, in terms, to the present facts —we think the exact cause of the misalignment, i. e. a deviation in the original installation or settlement and rebound after installation, need not be determined—it should have at least warned the contractor to proceed with care, expecting that it might meet some deviations and gaps. Caution would not have created undue strain. As the contracting officer found, the contractor, while fabricating the cone sections, could have provided trim allowances sufficient to accomplish satisfactory connection by leaving a small amount of excess steel on the upstream edge of the cone section. Plaintiff's error was to act as if it could confidently anticipate a perfect fit in a large-scale project of this kind.

■ Plaintiff argues alternatively that, if the gap between the penstocks and connecting rings is considered insubstantial, a satisfactory weld could have been made without refitting. The contracting officer's insistence on refitting is said to constitute a change for which plaintiff is entitled to reimbursement. The contractor, however, has offered no evidence indicating that welding, alone, would have been as satisfactory as first refitting and then welding the penstocks

to the rings. Plaintiff had the burden, but produced no proof before the Board on this point. In the absence of such information, we must accept the contracting officer's judgment that refitting was necessary to the successful fulfillment of the contractor's obligations. Nor does the bare fact that welding was rejected show, in itself, that the 7/8" gap was too substantial to fall within the tolerance allowed by the contract.

*Count II:* Installation of the penstocks involved the use of penstock risers which were connected to the penstocks by steel bars six inches in diameter. The contracting officer required the contractor to radiograph the welds on the ends of the bars linking the risers to the penstocks. A radiograph is an X-ray, in which a plate of film is exposed by rays passing through the metal. Radiographing of welds in unfired pressure vessels (such as the penstock apparatus) is often required to guard against hidden defects. Plaintiff contends, however, that radiographic examination of these particular welds was not a contract requirement, and seeks extra compensation for its work.

Both parties agree that the nub of this claim is the correct reading of Section 4–05c of the contract specifications, and specifically the clause stating that "the entire length of all joints in the penstocks and penstock risers shall be prepared and radiographically examined in accordance with the provisions of paragraph W–524 of the API–ASME Code * * *." The entire section and the available portions of the industry code are quoted in the margin.[3] Broadly, the Government

3. Section 4–05c(1) of the contract specifications:

"*Radiographic Examination.* The entire length of all joints in plate of 3/4 inch or more in thickness in the surge tanks and the entire length of all joints in the penstocks and penstock risers shall be prepared and radiographically examined in accordance with the provisions of paragraph W–524 of the API–ASME Code. Vertical joints in the surge tanks shells of less than 3/4 inch in thickness shall be spot examined by radiographing or sectioning in accordance with the provisions of

paragraph W–524.1 of the Code. The cost of the radiographic examination, as specified above, shall be included in the unit or lump sum bid price and no separate payment will be made. When doubt exists as to the soundness of any part other than as covered above, such part may be subjected to radiographic or other examination at the discretion of the Contracting Officer, and the cost of such inspection will be borne by the Government, provided no disqualifying defects are found. If defects are found, all costs of repair and

contends that the words "all joints" are clear and unambiguous, necessarily encompassing the weld in controversy. Reference to paragraph W–524 of the API–ASME Code is said to concern the procedure involved in radiographic examination, not to limit the type of joint to be examined. The contractor argues, on the other hand, that paragraph W–524 qualifies the entire clause, and therefore that the parties intended to radiograph only those joints specifically referred to in that paragraph of the Code (*i. e.* any butt-welded joint); the disputed weld is said not to be a butt-weld.

In denying recovery, both the contracting officer and the Board adopted the Government's plain-meaning interpretation of the specifications. Finding that the contract required "all joints in the penstocks and penstock risers" to be radiographed, they did not consider plaintiff's characterization of this specific weld.

Since interpretation of the contract specification is a legal question, we are in no way shackled by the Board's conclusion. If the record before us contained sufficient materials for us to define the contractor's responsibilities under Section 4–05c, we would be able to dispose of this claim on the pending motions. But the present record is insufficient, in our view, to support an ultimate determination.[4] We have several problems.

inspection shall be borne by the Contractor."

Available portion of paragraph W–524 of the API–ASME Code:

"*Procedure for Radiographic Examination of Welded Joints:*

"(a) Any butt-welded joint in a vessel wall, for which complete radiographic examination is mandatory in W–318.2, shall be examined throughout its entire length by the X-ray or gamma-ray method of radiography in accordance with the procedure given in the following paragraphs. Any butt-welded joint for which complete radiographic examination would not be mandatory in W–318.2(a) or (b) shall be similarly examined if this procedure becomes mandatory in the application of W–318.2(c), except in the following special cases for which radiographic examination may be considered impracticable:

"(1) For the final circumferential joint in a shop-constructed vessel in which a suitable access opening cannot be provided because of mechanical or process limitations.

"(2) For the final (or closing-up) circumferential joints in a field-assembled vessel."

Paragraph W–318.2 of the API–ASME Code:

"*Radiographing.*

"(a) Complete radiographic examination is required for all double-welded butt joints where the plate or vessel wall thickness at the joint exceeds 1½ in.

"(b) Complete radiographic examination is required for all double-welded butt joints in vessels built of steel complying with ASTM A 202, A 203, A 204, A 212, A 225, A 299, A 301, and A 302, if the plate thickness at any welded joint exceeds 1 in.

"(c) The increased joint efficiency allowed in Table W–318.2.1 for completely radiographed seams in a vessel or vessel section may be used in the design calculations provided:

"(1) All longitudinal and circumferential joints in the vessel wall are of the double-welded butt type, except nozzle and manhole attachment welds to the shell which need not be of the double-welded butt type; and

"(2) All such double-welded butt joints are radiographically examined throughout their length, as prescribed in W–524(a), except:

"(a) When vessels have a shell thickness that does not require complete radiographic examination in (a) or (b) above, circumferential joints shall be prepared and radiographed only within five times the plate thickness (or 4 in., whichever is more), on each side of any intersection with a longitudinal joint. All joints in a spherical shape and in torispherical and ellipsodial heads shall be, for this distinction, considered as longitudinal joints. For similar reasons, the juncture without a knuckle between a conical head and the shell, and the circumferential joints without a knuckle at either or both ends of a transition section shown in Fig. W–311, shall be radiographed if the adjacent longitudinal joints are to receive credit for being radiographed.

"(b) Welded butt joints of nozzles when radiographing is not mandatory by (a) or (b) above."

4. This deficiency does not stem from the fact that the parties are unable to present a definitive official record containing all that the Board considered. The information we need was probably not before the Board at all.

On its face, Section 4–05c(1) of the specifications is unclear as to whether it refers to paragraph W–524 of the API–ASME Code for a delineation of the sorts of welds to be radiographed, or merely for the procedure to be used in radiographing "all joints". The "rule of ambiguity" might therefore be said to favor the contractor, and we should look to the Code to determine which welds must be radiographically examined. The Code requires complete radiographic examination only of double-welded butt joints in vessels built of a certain grade of steel or where the plate or vessel wall thickness at the joint exceeds 1½ inch. Defendant tells us that the penstocks and risers do not meet either of these requirements, and, accordingly, that plaintiff's interpretation would greatly curtail, if not eliminate, the applicability of Section 4–05c to the project. This result, defendant says, shows that the contractor's reading cannot have been intended. In this connection, we should like to know whether or not this provision (Section 4–05c) was drafted, in its essential parts, especially for this project or whether it is a "boilerplate" clause, drafted to deal with the general question of radiographic examination of dam (or comparable) structures, and inserted into this contract routinely as a matter of course. The proper reading of the provision could well turn upon the nature of the clause—boilerplate or specially tailored for this contract.

Second, much of defendant's argument rests upon the observation that Paragraph W–524 of the Code prescribes procedures for radiographic examination. The portion of that paragraph contained in the stipulated record does not explicitly so prescribe. It does, however, refer to unspecified subsequent paragraphs for the detailing of such procedures. These other parts of the Code should be made a part of the record, so that we can read all together and thus understand the meaning of Paragraph W–524.

Furthermore, the present record does not disclose the physical feasibility of radiographing the welds in dispute, the relevant industry practice (if any), or the contemplated magnitude of plaintiff's expense in conducting the radiographic examination.

In the absence of such pertinent information, the court does not wish to resolve the substantive issue, or feel that it can do so adequately with its present information. If the parties are unable to cure these gaps by stipulation, we shall suspend our consideration of this claim and refer it to the Corps of Engineers Claims and Appeals Board to make the necessary findings of fact. See United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); Williamsburg Drapery Co. v. United States, 369 F.2d 729, 177 Ct.Cl. —— (Dec. 1966).

*Count III.* The third claim arises out of an increase in the price of steel which plaintiff supplied to the Government under a change order. There is no genuine factual issue in dispute, and the available record is quite adequate. The principal question is a legal one—whether this court should exercise its equitable powers to reform the parties' written contract.

In February 1955, the Government determined that the wye riser branches of each of the penstocks being constructed by plaintiff required strengthening by means of steel reinforcement and concrete encasement. Under Change Order No. 13, the contractor agreed to furnish all the necessary plant, labor and material (except concrete aggregate). An equitable adjustment for the additional work was to be agreed upon and embodied in supplements to the change order.

We are concerned with the parties' understanding and agreement on the procurement of the steel required by Change Order No. 13. Under that order, plaintiff solicited price quotations from several suppliers. One producer, Joseph Ryerson & Sons, gave a price of $7.53 per hundred pounds f. o. b. Riverdale, North Dakota. This price was acceptable to the

contracting officer as plaintiff's direct acquisition cost for the steel. The contractor thereupon placed orders with Ryerson for a portion of the steel to be purchased. The parties also agreed that plaintiff would be compensated pursuant to a unit-price formula covering its direct acquisition cost for the steel plus a percentage for profit (10%), overhead (10%) bond (1%).

Supplement No. 1 to Change Order No. 13, drafted by the Government and executed by plaintiff on July 27, 1955, set forth plaintiff's consideration for furnishing the reinforcing steel. Item 19 of the Supplement established, pursuant to the formula, the unit price for the Ryerson steel at $0.092. This figure was based upon a steel acquisition cost of $0.753 or $7.53 per hundred pounds. Since the total steel requirements were not fixed at this time, the Supplement estimated the quantity needed (3,500,-000 pounds) and the total price increase necessitated by the steel purchases ($322,000.00). The Supplement also provided: "It is understood and agreed that the price for welding joints in reinforcing bars and other price adjustments resulting from Change Order No. 13 will be established by a future supplement or supplements to Change Order No. 13, as will the time adjustment. All other terms and conditions of said change order shall be and remain the same."

On August 2, 1955, Ryerson notified plaintiff that its price of steel had been increased, effective July 6th, from $7.53 to $7.98 per hundred pounds. This increase affected only the contractor's final steel purchase of 592 tons, which was authorized by the Government and placed by plaintiff after the July 6th date. The price rise led to plaintiff's absorbing additional costs of $7,055.02 which it now seeks to recover.

■ A. Plaintiff first suggests that the terms of Supplement No. 1 provide a procedure by which the contracting officer should have allowed additional compensation as a result of Ryerson's price increase. It relies on the part of the Supplement which stated that the total price increase for the additional steel was "estimated", and that "other price adjustments resulting from Change Order No. 13 will be established by future * * * supplement." In this argument the contractor distorts the language of the Supplement. It is clear that the written agreement's total price increase was "estimated", not because of indefiniteness in the expressed unit price of $0.092, but due to uncertainty as to the amount of steel required under the change order. One of the terms of the Supplement was the "estimated quantity" of steel. This figure (3,500,000 pounds) multiplied by the unit price produced the "estimated" total price increase. Equally clearly, the quoted language from the Supplement refers to price adjustments for other particulars made necessary by the change order. Not less than twenty supplements covering various items were issued to implement Change Order No. 13. The contracting officer was under no duty to issue a second supplement increasing the price previously established. At most, the contract permitted the parties to refashion previous written agreements; it did not require it.

■ B. Plaintiff's principal argument, which we accept, is that the written contract, Supplement No. 1 to Change Order No. 13, providing for payment based upon a steel cost of $7.53 per hundred pounds, did not reflect the parties' true intention. We are urged to exercise our equitable power and reform the words of the contract "to meet the understanding and intention of the parties." Board of Commissioners of Port of New Orleans v. United States, 69 Ct.Cl. 52, 58 (1930). Where there has been a mutual mistake of fact causing the terms of the written contract to depart from the parties' actual understanding, this court, like other courts, will normally grant reformation. See, e. g., Sutcliffe Storage & Warehouse Co. v. United States, 112 F. Supp. 590, 125 Ct.Cl. 297 (1953); Chernick v. United States, Ct.Cl.1967, 372

F.2d 492. There is convincing evidence that such a mistake was present here.

As we have noted, after the plaintiff had begun construction of the penstocks, the Government determined that the wye riser branches in each of the penstocks required reinforcement. It was important to obtain the additional materials and complete this modification expeditiously or else work on other elements of the projects would fall behind the construction schedule. The contracting officer had the plaintiff purchase the quantities of steel necessary for the change. A modification of the cost-plus form of contract was used to provide the compensation. The contractor solicited prices from steel suppliers, subject to acceptance by the contracting officer if the price was justified by cost estimates prepared by the Government. After Southwest Welding procured the steel, the Government agreed that it would be reimbursed for its direct unit cost plus certain percentages of that amount for profit, overhead, and bond. More than that, the contracting officer has expressly found, "Had the contractor increased the price quoted by his steel supplier sufficiently to cover anticipated escalation and furnished justifying evidence that escalation was in the offing, the increased price would have been provided for in Supplement No. 1." We think that the circumstances which induced the steel purchase, the payment arrangement agreed to by the parties, and the contracting officer's finding all indicate that both the Government and Southwest intended that the plaintiff be compensated on the basis of its actual costs. This intention formed the essence of the parties' understanding.

■ Both parties, however, were guilty of mutual mistake—the burden of which currently rests on plaintiff alone. The mistake was that $7.53 per hundred pounds (the basis upon which the con-

tract unit price of $0.092 was computed) represented plaintiff's actual cost for procurement of steel. On July 27, 1955, when the parties reduced their understanding to writing, both the contractor and the Government shared the mistaken notion that $7.53 was plaintiff's steel procurement cost. It was not until August 2nd that plaintiff learned that its acquisition cost was $7.98, rather than the lower figure. The Government, also, although it had made cost estimates, was unaware that the contract had not represented the plaintiff's actual costs. The agreement, as written, conferred benefits upon the Government which neither party desired or intended.

Divergence of understanding from formal embodiment, such as this case reveals, is not at all novel, either in general contract litigation or in this court. Reformation of a contract to correct the parties' defectively expressed intention was the basis of the decision, for example, in Walsh v. United States, 121 Ct.Cl. 546, 102 F.Supp. 589 (1952). There, the Government had agreed to adjust the contract price to accord with the prevailing area wage rate for the contractor's employees. The parties knew that the wage rate might be increased from the existing rate of $1.12 per hour in the immediate future. When the contract was consummated, however, the parties were under the mistaken belief that the rate was still $1.12 per hour, while in fact it had been increased to $1.20. The court reformed the contract. A similar situation exists here and the remedy of reformation is equally available.[5]

The defendant claims that, at best, this is a case of the parties' common ignorance of the actual facts which, it argues, is never ground for reformation. See 5 Williston, Contracts § 1548, at 4341 (Rev. ed. 1937). We are clear that this court has not adopted that broad a rule.

---

5. The Engineers Board correctly held that it had no authority, under its contractual powers, to reform the contract. That holding is, of course, inapplicable to this court.

In allowing reformation in the *Walsh* case, supra, the opinion stated: "We think that, because of their mutual ignorance of a material existing fact, they [the parties] made a writing which they would not have made but for that ignorance; that if they had been aware of the actual fact, they would have negotiated and contracted on that basis." 102 F.Supp. at 591, 121 Ct.Cl. at 554. See also Poirier & McLane Corp. v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117 (1954) (reformation granted where mutual mistake of fact was the parties' mutual ignorance of the actual prevailing wage rate for area laborers, resulting in costs above those stated in written contract); National Presto Indus., Inc. v. United States, 167 Ct.Cl. 749, 338 F.2d 99 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965), and cases cited. However, since we regard the facts of this case to be well within the most traditional bounds of reformation, see 3 Corbin, Contracts § 614, at 713 (1960), we need not now reach defendant's wider legal contention. The parties obviously wished the Government to bear the cost of the steel, whatever it was. In that light, it is immaterial whether they happened to formulate their agreement as "The Government will pay $7.53, which we understand to be the acquisition cost of the steel" or as "The Government will pay the acquisition cost of the steel, which we understand to be $7.53." In the world of affairs, these phrasings are equivalents—two faces of the same coin. Legal relief should not turn on a scholastic and hypothetical attempt to cast the parties' implicit understanding into the former mold rather than the latter.

■ The Government argues, finally, that plaintiff was not diligent in protecting its interests and should therefore be denied recovery. The argument is that the price increase was directly attributable to a steel strike of June 1955 and that the contractor, dealing in steel fabrication and erection, should have been aware when it signed Supplement No. 1 that one of the consequences of the strike, and the subsequent wage agreement, would be a price rise. Even if we accept the Government's premise and assume that plaintiff was negligent in ascertaining the proper price, such conduct does not bar reformation. In most, if not all, cases of mutual mistake, at least one party to the contract has not exercised the highest level of care. But the contractor's negligence, alone, does not prevent reformation. This is especially true where the other party, rather than being harmed by the plaintiff's actions, has become an unintended beneficiary as has the Government in this controversy. Professor Corbin has observed that one might be "held responsible for harm to others if it is caused by his 'folly' or his negligent mistake, but his responsibility need not be carried so far as to permit others to profit by reason of his mistake." 3 Corbin, Contracts § 606, at 647–48 (1960); see also 5 Williston, Contracts § 1596, at 4447–49 (Rev. ed. 1937). We conclude that Supplement No. 1 should be reformed to reflect the intention of the parties and that plaintiff should recover its added procurement cost of $7,055.02.

The result is that the plaintiff's motion for summary judgment is granted as to Count III and judgment is entered for $7,055.02, but the motion is denied as to Count I and that part of the petition is dismissed. Conversely, defendant's motion is granted as to Count I and denied as to Count III. With respect to Count II, proceedings in this court are suspended as provided in this opinion.