**BOWEN–McLAUGHLIN–YORK COMPANY, a DIVISION OF HARSCO CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 71–82C.

United States Claims Court.

June 20, 1986.

Thomas A. Schmutz, attorney of record, for plaintiff; Karol Lyn Newman and Newman and Holtzinger, Washington, D.C., of counsel.

Sharon Y. Eubanks, with whom was Asst. Atty. Gen. Richard K. Willard, for defendant; Major Harry Lee Dorsey, Of-

fice of the Judge Advocate General, Dept. of the Army, Washington, D.C., of counsel.

OPINION

WIESE, Judge.

I.

This case involves a contract pricing dispute in which plaintiff Bowen-McLaughlin-York Company ("BMY") seeks reformation of a fixed-price contract that it entered into with the United States Army Tank-Automotive Command ("TACOM"). The contract involved production of M88A1 tracked recovery vehicles and dieselization conversion kits for the M88 vehicle; the contract amount was $146 million. At issue are certain escalation costs on purchased materials which were omitted from the final agreed-upon contract price by oversight on BMY's part. The amount in question, exclusive of contractor-added markups, is approximately $700,000. BMY argues its entitlement to reformation of the contract price on alternative theories of unilateral and mutual mistake.

The case had been previously before the court on the parties' cross-motions for summary judgment directed to the unilateral mistake argument. These motions were denied by order dated November 29, 1985, and the case subsequently went to trial on March 18 through March 21, 1986 to hear evidence on both mistake theories. On the basis of the evidence disclosed at trial, the court has made findings of fact which appear in the appendix to this opinion. From those facts, we conclude that plaintiff is not entitled to prevail as a matter of law. The reasons which dictate this result are given below; for purposes of the discussion we assume a familiarity with the facts as given in the appendix.

II.

A.

■■ Mistake, as that word is used in the law of contracts, refers to a belief that is not in accord with existing facts. *Restatement (Second) of Contracts* § 151

(1981). Such a belief, even when not shared by the other party to a contract, may under certain circumstances be recognized as a basis for rescission of an agreement or for its reformation. The *Restatement*, § 153, states the rule applicable to cases where relief for unilateral mistake may be allowed:

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
>
> (b) the other party had reason to know of the mistake or his fault caused the mistake.

With respect to the foregoing, the court previously ruled in its order of November 29, 1985 that the pricing error involved here qualified as a material mistake as to a basic assumption, the risk of which the contract had not expressly allocated to either party. Left for trial and later decision was the issue we now confront: whether the individuals who negotiated the contract on behalf of the Government had reason to know that BMY had unintentionally omitted escalation costs on certain purchased ordnance parts (components of the M88A1 vehicle) at the time that it agreed to the fixed price.

"Reason to know" is the *Restatement's* analytically more precise term for "constructive knowledge". The *Restatement* explains that "[a] person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist." *Restatement (Second) of Contracts* § 19 comment b (1981). The comment continues on to say that "reason to know" is to be used "both where the actor has a duty to another and where he would not be acting adequately in the protection of his own interests were he

not acting with reference to the facts which he has reason to know." *Id.*

As applied in the context of Government contracting, we deem the "duty" referred to as involving no more than the Government's basic obligation to honestly and fairly evaluate a prospective contractor's submission (the proposal or the bid) in accordance with the solicitation criteria and applicable procurement regulations. And, in discharging this duty to the contractor, the Government may be viewed as simultaneously acting in the protection of its own interests. Thus, in the typical procurement context, it fits the situation to say that even though the Government may be ignorant in fact of mistakes in the contractor's submission, still it will be charged with the knowledge thereof if, under like circumstances, a person of ordinary intelligence [1] would have been led to infer the existence of the mistake or its reasonable possibility.

In the present case, the Government did undertake a review of BMY's cost and price submissions. In fact, it went well beyond that: the Government twice had occasion to examine the underlying data, once by the Defense Contract Audit Agency ("DCAA") and later by TACOM. In the course of these reviews the Government confronted the purchase orders which showed that BMY was acquiring certain parts pursuant to contracts whose prices were subject to escalation.

Indeed, it is clear that TACOM personnel not only had access to but, more importantly, possession of a number of documents whose texts bore reference to this fact. These documents included copies of: (i) a BMY memorandum of negotiations with Berwick Forge and Fabricating Company (one of the two suppliers whose escalation costs BMY failed to identify) which noted the parties' agreement to an order price of "$14,117.56 per set plus an Economic Price Adjustment, Code 10",[2] (ii) the June 1977 "Procurement Plan for Award of 140 Sets of Castings to Buckeye Steel Castings Company" (the other supplier whose prices were subject to escalation) which identified the pricing provision of the purchase order to be issued as a "Firm Fixed Price w/Economic Adjustment Clause (Material Only) Code 10 Metal and Metal Products", and (iii) a DCAA audit report covering BMY's interim pricing which contained footnotes identifying that certain ordnance parts were subject to price escalation.

Based on this evidence, it seems certain that the Government negotiators, at some point during the cost verification and price negotiation processes, at least scanned documents which, if carefully considered side-by-side, bespeak the mistake's existence. When considered in context, however, this finding does not lead to a conclusion that the Government negotiators had reason to know that BMY had failed to include any allowance for price escalation in its final proposed material costs. Several reasons require this result.

In the context of this procurement, which involved BMY's purchase of over 3,000 ordnance parts per vehicle, information concerning the possibility of price escalation on sixteen of those parts was not so significant in its own right as to have forged itself upon one's memory. And this would be true even though those parts were being acquired under two purchases each of which represented a sizeable percentage of the total vehicle cost—roughly 18 percent in the case of the Buckeye order and approximately 7 percent in the case of the Berwick order. Moreover, the information

---

1. The *Restatement* makes clear that the intelligence level of a particular person must be considered when determining if that person has reason to know a fact. *See Restatement (Second) of Contracts* § 19 comment b (1981) ("[a] person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference").

2. "Code 10" is a shorthand reference to the Composite Index for Metals and Metal Products Code 10, as listed under the category titled "Wholesale Price Index, Industrial Commodities", published by the U.S. Department of Labor, Bureau of Labor Statistics.

concerning escalation that appeared in the above-mentioned documents was not displayed in such fashion as to arrest a reader's attention. Generally, the reference to escalation appeared as part of a single paragraph in a multi-page document.

Additionally, the two TACOM individuals primarily involved had to assimilate vast amounts of pricing information between them, including the details of some 250 purchase order files. In light of the magnitude of this task and the relatively short amount of time allowed for this effort (they spent roughly two weeks at BMY's plant), one cannot say that they had reason to detect the pricing inconsistency at issue here. That BMY also missed the mistake, even after TACOM on two occasions questioned the existence of escalation on the two purchase orders involved, is further evidence of the mistake's submerged nature. The court therefore concludes that a person of the negotiators' intelligence would not necessarily infer the existence of BMY's mistake from the mass of pricing data reviewed. Hence, the Government did not have reason to know of the error, and BMY's unilateral mistake argument must fail.

## B.

BMY next relies on the doctrine of mutual mistake [3] to support its claim for reformation. It contends that where a mutual mistake of fact has occurred, the court should reform the contract "to meet the understanding and intention of the parties." *Southwest Welding & Manufacturing Co.*, 179 Ct.Cl. 39, 51, 373 F.2d 982, 989 (1967) (quoting *Board of Commissioners of the Port of New Orleans v. United States*, 69 Ct.Cl. 52, 58 (1830). In this case, the contractor argues, the mistake prevented the parties from realizing their joint intention to execute a contract that compensated BMY for all of its materials costs.

■ We cannot accept this argument because we do not see in the facts before us that mutual intention on which the success of this argument depends. It is true that in the early stages of performance the parties operated under contract arrangements that assured the contractor full reimbursement of all costs. But these arrangements, involving first a letter contract subsequently converted to a price redeterminable contract, were never meant as more than interim measures to accommodate the contractor's need for time in which to acquire reliable cost and pricing data prior to definitization of a final, fixed-price contract. That the Government was willing, during this interim period, to absorb all material costs that BMY was experiencing, does not mean that that same intent is also to be found in their final arrangement. Rather, the lengthy period allowed BMY to finalize all vendor prices (almost 25 months), and the execution of a contract that contemplated a firm, fixed price without any provision for escalation, clearly evidences the Government's intention to limit its financial exposure to the figures agreed upon and thus to allocate to the contractor the burden of all unallocated pricing risks.

The contractor places much reliance upon the above-cited case of *Southwest Welding & Manufacturing Co. v. United States*, 179 Ct.Cl. 39, 373 F.2d 982 (1967), in which the court granted reformation to correct an erroneous, contractor-supplied material cost figure which the parties had incorporated into a pricing supplement to a construction change order.

Though in many respects the case is similar to the present one, there are differences which ultimately highlight the shortcomings of BMY's position here. The primary distinction between the cases is that

---

**3.** The requirements for relief because of mutual mistake essentially parallel the requirements for relief for unilateral mistake.

Section 152 of the *Restatement (Second) of Contracts* states the rule in these terms:

Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

the contract involved in *Southwest Welding* was of a cost-plus nature. True, the "supplement" directly at issue there identified a fixed price for the material involved, but this supplement was executed within the framework of an existing final agreement between the parties the terms of which specifically contemplated that the contractor be compensated for all direct material costs plus a percentage for profit, overhead, and bond. *Id.* at 51, 373 F.2d at 989. In this court's view, such a cost-plus arrangement in the underlying contract manifests a clear Governmental intent to reimburse the contractor for all its material costs. Thus the *Southwest Welding* court had a sound basis for its conclusion that "both the Government and Southwest intended that the plaintiff be compensated on the basis of its actual costs." *Id.* at 51, 373 F.2d at 990.

■ In the present case, by contrast, the indicia of a similar Governmental intent are not persuasive. As discussed above, the signs of such an intent which do exist command no legal significance in the face of a final, fixed-price contract. Such a contract legally implies an allocation to the contractor of all unallocated pricing risks, including that of a clerical error. Relief from such error is allowable only under the circumstances enumerated in Sections 152 and 153 of the *Restatement (Second) of Contracts*, and those circumstances are not met here. The economic consequences of the mistake must therefore be borne by the contractor alone.

### III.

For the reasons given in this opinion, the Clerk is directed to enter judgment dismissing the complaint. Each side shall bear its own costs.

### APPENDIX

#### Findings of Fact

1. Plaintiff is Bowen-McLaughlin-York Company ("BMY"), an unincorporated division of Harsco Corporation. BMY is located in York, Pennsylvania. BMY has produced military vehicles for the United States Army, including the M88A1 vehicle.

2. Defendant is the United States of America, acting through its agent the United States Army Tank-Automotive Readiness Command, Warren, Michigan, of the United States Department of Defense ("TACOM").

3. The contract which is the subject matter of this action is Contract No. DAAE07–77–C–0278, as modified ("Contract 0278"), between BMY and TACOM.

4. On March 7, 1977, BMY received Request for Proposal ("RFP") No. DAAE07–77–R–0088 requesting BMY to submit a cost proposal to TACOM for production of M88A1 recovery vehicles and conversion kits to be used to modify existing M88 vehicles. The RFP requested submission of BMY's proposal by April 18, 1977.

5. At the time the RFP was issued, BMY was producing M88 recovery vehicles for TACOM under Contract No. DAAE07–75–C–0272 ("Contract 0272").

6. By letter dated March 14, 1977, Mr. Albert Farrar, Vice President of BMY, acknowledged receipt of the RFP and advised TACOM that the requested submission date of April 18, 1977, would not allow BMY sufficient time in which to prepare a comprehensive proposal.

7. Mr. Farrar's letter further advised TACOM that it had been BMY's experience that, in negotiated procurements (as was here intended), a minimum of 22 months start-up time was required between the date on which action on a new proposal was initiated and the first scheduled delivery took place. Therefore, in order to meet the planned first delivery date in March 1979 (without suffering a break in production on the M88 recovery vehicles then being produced under Contract 0272), Mr. Farrar advised TACOM that BMY would require a "letter contract" (*i.e.*, a binding authorization to proceed) no later than May 1977.

8. By letter dated March 16, 1977, Mr. Farrar provided TACOM with an estimate of the per-vehicle and per-conversion kit price to enable a letter contract to be is-

sued. Mr. Farrar stated that the estimated prices represented projections applicable at the start of delivery. The estimates, Mr. Farrar noted, would still require the inclusion of an economic price adjustment clause in the contract to cover material cost increases subsequent to the start of deliveries.

9. Contract 0278 was executed on March 31, 1977, as a letter contract between BMY and TACOM before an agreement on price had been reached because of TACOM's pressing need for the M88A1 tracked recovery vehicles.

10. Under the terms of the Letter Contract, as subsequently modified, BMY agreed to supply TACOM with M88A1 tracked recovery vehicles and M88A1 vehicle conversion kits.

11. The Letter Contract, by its terms, was intended to serve as an interim agreement permitting BMY to commence performance prior to formalization of all of the terms and conditions of the definitized contract.

12. Among the provisions of the Letter Contract was a "Definitization" clause which stated, in part, that a "fixed price with escalation type contract is contemplated." To accomplish this result, the clause obligated BMY "to enter into negotiation promptly with the Contracting Officer over the terms of a definitive contract".

13. The Letter Contract contained an economic price adjustment ("EPA") clause.

14. The EPA clause provided, in substance, that the Government would pay increases in the cost of materials due to price escalation (or, correspondingly, receive the benefit of any material cost decreases). The permissible amount of price adjustment was keyed to changes in the composite Index for Metals and Metal Products Code 10, as listed under the category titled "Wholesale Price Index, Industrial Commodities", published by the U.S. Department of Labor, Bureau of Labor Statistics.

15. An economic price adjustment provision was essential to BMY in order to protect the company against rapidly escalating material costs. In performing its contracts for TACOM, BMY, when necessary, included economic price adjustment clauses in its contracts with suppliers.

16. At the time the Letter Contract was entered into, BMY was performing two contracts with TACOM for tracked recovery vehicles, each of which included an economic price adjustment clause.

17. At the time Contract 0278 was entered into TACOM knew that BMY had included economic price adjustment clauses in material-supplier purchase orders issued under two earlier vehicle production contracts.

18. Upon commencing contract performance under Contract 0278, BMY began issuing purchase orders for necessary materials.

19. BMY's June 9, 1977, "Procurement Plan For Award of 149 Sets of Castings to Buckeye Steel Castings Company, Contract DAAE07–77–C–0278", identified the pricing provision of the purchase order to be issued to Buckeye Steel Castings Company ("Buckeye") as a "Firm Fixed Price W/Economic Adjustment Clause (Material Only) Code 10 Metal and Metal Products".

20. Incorporated into the June 9, 1977, Buckeye Procurement Plan was Form BMY 628 which identified the method for calculating cost escalation under BMY's purchase orders.

21. The method for calculating cost escalation on materials, as set forth on Form BMY 628, tracks the economic price adjustment provision in Letter Contract 0278.

22. The Letter Contract required BMY to submit a price proposal on or before April 29, 1977. The target date for definitization of a contract was July 29, 1977.

23. On June 24, 1977, BMY submitted its pricing proposal on the Letter Contract. This submission included DD Forms 633 (pricing proposal summaries) for, *inter alia*, 149 each M88A1 Medium Recovery Vehicles and 140 each M88 MRV Conversion Kits for Dieselization; Bills of Materials—Vehicles; Labor Summary—Vehicles; Miscellaneous Costs—Vehicles; Bills of

Materials—Conversion Kits; Labor Summary—Conversion Kits; Concurrent Repair Parts.

The proposal advised TACOM that due to the lack of time in which to obtain quotations from vendors, many of the prices listed in the bills of materials had to be estimated. It was expected, however, that by the time the negotiations commenced, actual prices would be available in lieu of the estimates. In view of the tentative nature of its initial pricing, BMY advised TACOM that all prices were "subject to upward or downward adjustment."

24. On June 27, 1977, BMY issued a purchase order to Buckeye Steel Casting Company ("Buckeye") for steel and cast steel armor parts.

25. The Buckeye purchase order provided for a firm, fixed price subject to economic price adjustment, referencing and attaching the BMY Procurement Plan and Form BMY 628.

26. The total price of the Buckeye purchase order, without escalation, was $5,273,212.36.

27. On a per-vehicle basis, the base price of the Buckeye purchase order (i.e., price before any escalation) amounted to $35,397.68 or approximately 18 percent of the total estimated per-vehicle material cost.

28. On September 9, 1977, the Defense Contract Audit Agency ("DCAA") issued an "Audit Report on Evaluation of Initial Pricing Proposal Submitted By Bowen-McLaughlin-York Company (A Division of Harsco Corporation) York, Pennsylvania", Audit Report No. 6161–21–7–0415. The audit report covered BMY's June 24, 1977, bills of materials, as well as BMY's revised BMY bills of materials dated August 26, 1977, which incorporated price changes based on quotations received since the June 24, 1977, submission.

29. From October 14, 1977, through November 4, 1977, TACOM and BMY conducted negotiations with a view towards reaching an agreement to definitize the Letter Contract.

The TACOM personnel involved in these negotiations were: James D. Burnham, then Contracting Officer and Chief of the Recovery Vehicle Section, Combat Support Vehicle Branch, Tracked Vehicle Systems Division; Joseph Martin, Chief of the Contracting Pricing Services Division; Frank Welch, Assistant Chief of the Tracked Vehicle Systems Division; Elmer F. Enders, Chief of the Contract Processing Cost Estimate Branch, Contract Pricing Services Division; Donald Ludwig, Contract Price Analyst, Contract Processing Cost Estimate Branch; George R. Schoenberg, Contract Price Analyst; and Al P. Schwartzenfeld, then Chief Contract Pricing Services Division.

The BMY personnel primarily involved in these negotiations were: Albert Farrar, lead negotiator for BMY; George Kingsbury, accounting; Lou Newman, materials; Clete Shirey, materials and labor hours.

30. At the time negotiations on Contract 0278 began in October of 1977, BMY had just completed production of the first M88A1 vehicle under Contract 0272.

31. Despite serious negotiations, as of November 4, 1977, TACOM and BMY were not able to reach an agreement on price. The principal reason for this impasse was that many of the vendor costs which BMY had listed in its price proposal of June 24, 1977 remained open-ended, i.e., the underlying purchase contracts had not yet been converted from price adjustable to firm, fixed-price commitments.

32. Because the parties were unable to reach agreement on the various cost elements (due, as noted, to uncertainty concerning final vendor costs) they therefore decided upon an interim pricing arrangement which involved agreement on an absolute "ceiling price" together with an adjustable "billing price". Accordingly, Contract 0278 was modified on November 23, 1977 to a "price redeterminable" contract by Modification PZ0008 ("PZ0008"). (A price redeterminable contract is in essence, a cost reimbursable contract subject, in this

particular case, to a fixed or non-redeterminable ceiling price.)

33. Modification PZ0008 adopted the figure of $56,737,175.00 for contract billing purposes and the figure of $60,957,475.00 as the contract ceiling amount. Contract 0278, as modified, also provided for a unit billing price and a unit ceiling price for each of the contract line items. It was anticipated that the billing price would be adjusted downward if, at any time during performance, it appeared from BMY's cost submissions that the final redetermined price would be substantially lower than the billing price. Conversely, the contract provided for negotiation of an upward adjustment to the billing price if, at any time during performance, it appeared from BMY's cost submissions that the redetermined price would be substantially higher than the billing price.

34. The price redetermination provision in PZ0008, Section J05, provided for a per-vehicle billing price of $280,000 to $285,000 and a per-vehicle ceiling price of $300,000. That same provision also established two separate periods for price redetermination. As to each period of performance, BMY was required to submit (i) proposed prices for supplies to be delivered during the succeeding period including an estimate and breakdown of costs; and (ii) "a statement of all costs incurred in the performance of this contract through the end of the 1st. month prior to the date of the submission of proposed prices * * * together with sufficient supporting data to disclose unit costs and cost trends" for services and supplies delivered and for work in progress.

35. The price redeterminable contract entered into by the parties (PZ0008), on November 23, 1977, did not foreclose BMY from entering into cost reimbursement contracts with its subcontractors. The costs incurred under such subcontracts were to be flowed through to the Government in the price redetermination negotiations provided that the overall costs did not exceed the ceiling price. However, the price redeterminable contract did not contain an EPA provision.

36. As an interim procedure under Section J05, after deliveries commenced, BMY was required to submit to the contracting officer each quarter the following information:

1. The total contract price for delivered supplies for which final vendor prices had been established;

2. The total costs incurred for and allocable to delivered supplies for which final prices had not been established;

3. The portion of profit attributable to the delivered supplies; and

4. The total amount of all invoices or vouchers for delivered supplies.

To the extent BMY's invoices to the Government exceeded its quarterly reported costs plus allocable profit, BMY was required to refund the excess to the Government.

37. The billing price established by modification PZ0008 was simply an interim pricing measure which would allow BMY to begin billing the Government during the outset of performance while costs were still being accumulated. All parties recognized that the billing price was less than the amount BMY would ultimately require once it had ascertained its true costs.

38. The ceiling prices set forth in Modification PZ0008 included projected escalation on materials costs.

39. The two periods for price redetermination set forth in Section J05 of PZ0008 were (i) March 31, 1977 to September 30, 1978, and (ii) September 30, 1978 to contract expiration. September 30, 1978 was established as the price redetermination date for the end of the first period.

40. Section J05 also provided that upon receipt of contractor's cost data, BMY and the contracting officer "shall promptly negotiate to redetermine fair and reasonable contract prices for supplies which may be delivered and services which may be performed in the period following the effective date of price redetermination."

41. A price redeterminable type contract was entered into to allow BMY time to gain the cost experience necessary under Contract DAAE07–75–C–0272 in order to make its cost proposal on Contract 0278 more meaningful.

42. The purpose of changing Contract 0278 to a price redeterminable contract was to decrease BMY's forward pricing risks and thereby decrease the amount of contractor profit that TACOM would otherwise have to pay.

43. As a redeterminable contract, Contract 0278, as modified by PZ0008, was intended to minimize cost risks to both parties. Cost risks were minimized because, to the extent possible, TACOM would pay and BMY would receive only actual costs. This was particularly true with regard to material costs which were, at the time the final price was negotiated, almost entirely under purchase order.

44. By Modification No. P00018, dated September 13, 1978, the billing price and the ceiling price were revised upward to: billing price—$74,212,755; ceiling price—$79,609,750.

45. By Modification P00019, dated September 28, 1978, the two price redetermination periods established in PZ0008 were changed to (i) March 31, 1977 to January 31, 1979, and (ii) January 31, 1979, to the date of contract expiration. January 31, 1979, was established as the "effective date of price redetermination for the second period."

46. On October 25, 1978, BMY issued two purchase orders to Berwick Forge and Fabricating Company ("Berwick") for steel armor plate. The first page of each of the Berwick purchase orders identifies the "TYPE OF ORDER" as "FIRM FIXED PRICE WITH ECONOMIC ADJUSTMENT" and references Form BMY 628. The total amount of these two orders (without escalation) come to $3,501,154.60.

47. On a per-vehicle basis, the base price alone of the Berwick purchase order (i.e., price before any escalation) amounted to $14,117.56 or approximately 7 percent of the negotiated per-vehicle material cost.

48. On November 3, 1978, BMY submitted to TACOM revised Bills of Materials on Vehicles and Kits.

49. On November 15, 1978, BMY submitted to TACOM the balance of its price redetermination proposal for 248 M88A1 Medium Recovery Vehicles and 200 Conversion Kits. The overall proposal, as submitted, consisted of DD Forms 633, with attachments, for 248 each Medium Recovery Vehicles and 200 each Dieselization Kits; Bills of Materials on Vehicles and Kits; Labor Summary on Vehicles and Kits; documents supporting BMY's miscellaneous costs; and documents supporting repair parts costs. BMY's proposed contract price came to $86,006,203, with a proposed per-vehicle cost of $325,983.94.

50. The Bills of Materials which BMY submitted on November 3, 1978 as part of its November 15, 1978, price redetermination proposal, continued to include price estimates on many of the line items because current quotes on these items had not yet been received, nor had the covering purchase orders been placed.

51. By memorandum dated November 28, 1978, from TACOM to Defense Contract Administration Services Management Area (DCASMA), in Reading, Pennsylvania, TACOM requested DCASMA to obtain a DCAA audit and DCASMA technical evaluation of Contract 0278. In addition to the normal audit of materials costs, DCASMA and DCAA were directed to (i) conduct a review of one hundred percent of all purchased parts of $25.00 or more; (ii) compare proposed material costs with current and past purchase orders, quotes and invoices; (iii) prepare a schedule comparing current and past proposed material costs for those items over $25.00, identifying all deviations; and (iv) review and analyze the terms and conditions affecting purchased parts as noted on BMY's quotes and purchase orders.

52. On December 7, 1978, DCASMA requested DCAA to conduct such an audit.

53. On January 23, 1979, DCAA submitted its Audit Report No. 6161–9B210022–052 "Audit Report On Evaluation Of Pricing Proposal Submitted For Use In Connection With And Response To Price Redetermination Clause By Bowen-McLaughlin-York Company (A Division Of Harsco Corporation) York, Pennsylvania".

54. The report's introductory comments noted the existence of special circumstances adversely affecting the reliability of the audit results including the fact that the contractor's "bill of materials * * * does not include current prices for over 50 percent of the approximate 3,000 line items, nor were make-buy decisions complete at the time of audit." The report went on to point out that, because of the uncertainty inherent in the contractor's pricing (over 50%), projections based on the audit samples would be meaningless.

The report contained a listing of questioned material costs (divided between base costs and contractor-added escalation costs) that reflected the results of the price analysis on the sample items. Included in this list were parts to be supplied by Buckeye and Berwick. However, these parts were identified only by ordnance part number, not by supplier source. The listing was accompanied by footnote references indicating which of the listed ordnance parts were being acquired pursuant to purchase orders containing escalation clauses.

55. On January 19, 1979, BMY submitted to TACOM its final revised Bill of Materials. This updated Bill of Materials for 248 Vehicles consisted of 262 separate sheets each of which listed the pricing data for approximately ten components. As was the case with the audit report, the components were identified by ordnance part number and nomenclature, not by manufacturer or supplier name. The price data was given in terms of base costs and escalation costs as extended by the quantity ordered. For example, sheet number 120 of the January Bill of Materials included a number of parts which BMY had under order with Buckeye. The information appeared as follows:

| Ordnance Part Number | Nomenclature | Unit Base Cost | Unit Escal. Cost | Qty Per Vehicle | Purchased Items Vehicle Costs | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Base | Escal. | Total |
| 8763775 | Extension | 171.92 | –0– | 1 | 171.92 | –0– | 171.92 |
| 8763776 | Extension | 171.92 | –0– | 1 | 171.92 | –0– | 171.92 |
| 8763777 | Arm | 512.03 | –0– | 1 | 512.03 | –0– | 512.03 |
| 8763778 | Arm | 512.28 | –0– | 1 | 512.28 | –0– | 512.28 |

56. In preparing the January 19, 1979, Bill of Materials, BMY purchasing department personnel neglected to include any escalation costs in the price information that was shown for the ordnance parts being acquired under the Buckeye and Berwick purchase orders. The normal practice for these personnel would have been to include either an estimated amount for escalation (in instances where the precise amount was not known) or a notation that the parts were subject to an EPA provision. In this particular instance, however, escalation was either not referenced or else it was shown as a zero amount ("0") for all but one of the sixteen ordnance part listings that together comprised the Buckeye and Berwick purchases.

57. During the period January 15–26, 1979, TACOM sent a pricing team to BMY to review BMY's proposed costs. The team, which performed a review of BMY's material costs, consisted of Messrs. Roy Miller, Senior Price Analyst, Marque Cryderman, Price Analyst, James Nasto, and Donald Ludwig. Both Mr. Nasto and Mr. Ludwig were responsible for the technical evaluation of labor hours. Mr. Miller, who

had been employed as a price analyst since 1974, and Mr. Cryderman were responsible for reviewing BMY's material costs, including the cost of the parts supplied by Berwick and Buckeye.

58. The DCAA audit report of January 23, 1979, was provided to Messrs. Miller and Cryderman during their review of BMY's materials cost.

59. Mr. Miller had primary responsibility for reviewing the Buckeye and Berwick purchase orders. While at BMY, Mr. Miller reviewed the Buckeye and Berwick purchase files, but never saw the actual purchase orders. Between them, Mr. Miller and Mr. Cryderman were able to review some 250 purchase order files out of an approximate total of 3,000 files.

60. While at BMY in January 1979, Mr. Miller reviewed the document titled "Procurement Plan For Award of 149 Sets of Castings to Buckeye Steel Castings Company, Contract DAAE07–77–C–0278, June 9, 1977". This document, part of which Mr. Miller later had occasion to quote in an in-house memorandum, stated in paragraph 3 of page 1 the following:

> Order for one hundred forty-nine (149) units to be Firm Fixed Price W/Economic Adjustment Clause (Material Only) Code 10 Metal and Metal Products. Sixty-five percent (65%) of unit casting price shall be deemed material costs.

61. Beginning in January of 1979, BMY began receiving invoices from Buckeye for the accumulated escalation. By the time Contract 0278 was definitized on June 15, 1979, BMY had received the following invoices for escalation from Buckeye:

> a. Invoice A–011 dated January 12, 1979 in the amount of $34,639.25
>
> b. Invoice C–010 dated March 22, 1979 in the amount of $63,583.58
>
> c. Invoice F–001 dated June 8, 1979 in the amount of $75,648.60

The amounts represented by these invoices were never included in the BMY Bill of Materials and thus were not included in the contract price. The BMY negotiators of Contract 0278 were unaware that these invoices had been submitted by Buckeye and paid by BMY.

62. On two occasions after January 19, 1979, TACOM inquired of BMY whether there was any escalation on the Buckeye and Berwick purchase orders. BMY advised TACOM that there was none, this despite the fact that both companies had invoiced and received payments from BMY for escalation costs as authorized by the terms of their respective supply contracts.

63. Beginning on April 10, 1979, and continuing until June 7, 1979, BMY and TACOM conducted a number of negotiation sessions in order to arrive at a final contract price. Because virtually all of BMY's material requirements were by now under purchase order, there was little disagreement over the total material cost. In early June, 1979, BMY and TACOM reached agreement on material costs of $191,771 per vehicle based on actual cost data. As noted, no amount had been included in the material costs to cover escalation on the Berwick and Buckeye purchase orders.

64. During the first day of negotiations, on April 10, 1979, TACOM specifically questioned Buckeye base material costs, as well as escalation costs, and requested explanations from BMY.

65. During the first day of negotiations, on April 10, 1979, TACOM specifically questioned BMY as to the basis of its negotiated Berwick prices.

66. Also, on April 10, 1979, TACOM gave BMY a written list of parts, and cost data, about which TACOM had questions. These questions resulted from discrepancies found by TACOM based upon a comparison of BMY's January 19, 1979 Bill of Materials and BMY's purchase files.

67. On or about April 30, 1979, BMY submitted to TACOM responses to TACOM's questions and copies of certain requested purchase orders, including the June 27, 1977, Buckeye purchase order for 149 sets which had been earlier requested by Mr. Miller. The latter was a multi-page document, page 4 of which noted, *inter alia*, the following: "Type of Order: Firm Fixed Price With Economic Adjustment Clause (Material Only)."

68. Roy Miller and Marque Cryderman saw the Buckeye purchase order (one of the two orders whose omitted escalation costs are at issue here) for the first time on or about May 1, 1979. They did not see the Berwick purchase orders (likewise a source of omitted escalation costs) until 1980, months after the definitized agreement had been executed.

69. BMY's negotiators, primarily Mr. Kingsbury and Mr. Farrar, relied entirely on the January 19, 1979, Bill of Materials in negotiating material costs. Because of the absence of any notation in the Bill of Materials that the Berwick and Buckeye purchase orders were subject to economic price adjustment, both Mr. Kingsbury and Mr. Farrar negotiated the contract price under the mistaken impression that the Buckeye and Berwick purchase orders were firm, fixed-price orders.

70. Similarly, the TACOM negotiators and price analysts also mistakenly believed the Buckeye and Berwick purchase orders to be firm, fixed-price orders.

71. Had BMY's negotiators realized that the two purchase orders were subject to economic price adjustment, they would have insisted that the contract price cover these costs. Mr. Kingsbury and Mr. Farrar would have demanded an open provision calling for an increase in the contract price totaling the amount of escalation plus indirect costs and profit.

72. TACOM negotiators and price analysts testified that had BMY requested escalation on the Buckeye and Berwick purchase orders and supported the request with appropriate data, TACOM would have agreed to include such escalation in the final negotiated price for materials.

73. During the negotiation of material costs, escalation was negotiated on particular parts, when BMY raised the need for escalation.

74. Although BMY and TACOM had little difficulty in reaching an agreement on material costs, other areas of the contract pricing, especially labor hours and general and administrative expenses, proved much more troublesome.

75. On June 5, 1979, BMY and TACOM were $9,398.00 apart in their respective unit cost proposals for the M88A1 recovery vehicle. This dollar difference was exclusive of any allowance for profit.

76. On June 6, 1979, the contracting officer and BMY negotiated a "bottom line" unit price. The agreement was reached when the contracting officer increased the Government's offer by $5,000 per vehicle. In the contracting officer's mind this $5,000 figure was an "arbitrary" number offered to facilitate the conclusion of negotiations.

77. BMY accepted the contracting officer's offer of $286,700.00 per vehicle as the bottom line firm, fixed price for each M88A1 recovery vehicle.

78. Final fixed prices were agreed upon on June 7, 1979, and formalized on June 15, 1979, with Modification P00023 ("Modification 23"). Modification 23 makes no provision for economic price adjustment.

79. Modification 23 was entered into after extensive arm's-length negotiations between BMY and TACOM. The goal of these negotiations had been to examine BMY's cost proposal, to determine whether BMY's proposed costs were adequately supported, and to arrive at a fair and reasonable contract price.

80. After the conclusion of negotiations, Mr. Miller, the TACOM lead price analyst for Contract 0278, prepared a detailed memorandum dated June 13, 1979 setting forth the parties' agreement as to each element of cost. As to material costs, Mr. Miller acknowledged that the parties had reached a specific agreement on material cost of $191,771. As to other indirect costs, and labor hours, Mr. Miller noted that the parties reached agreement only on a pro forma basis.

81. As a step in the definitization of the contract, BMY was required by Armed Services Procurement Regulation § 3–807.4 to obtain cost and pricing data from its subcontractors, which included Chrysler Corporation, Onan Corporation, and Pacific Car and Foundry Company ("Pac-Car").

82. Onan and Pac-Car refused to allow BMY to audit their records and refused to

allow the release of a subsequently performed DCAA audit to BMY. Accordingly, BMY was unable to comply with the provision of ASPR § 3–807.4 and, therefore, could not finalize its subcontract prices with these two suppliers.

83. Because BMY had not been permitted to conduct its own audits of Onan and Pac-Car or to obtain the results of the DCAA audits of those companies, TACOM undertook to negotiate final contract prices with these two firms for BMY.

84. TACOM was unable to finalize the subcontracts with Onan and Pac-Car by June 15, 1979. Accordingly, Section J11 and Exhibit O (together titled "Price Adjustment For Subcontracts"), were added to Modification 23 to allow TACOM additional time to negotiate and finalize these subcontracts for BMY and also to allow it an opportunity to review the Chrysler subcontract which BMY had been able to finalize on its own.

85. Section J11 and Exhibit O did not change the intent of Modification 23 to make contract 0278 a firm, fixed-price contract, without an EPA provision. Exhibit O contained per-unit ceiling prices to be paid to each of the relevant subcontractors and TACOM included these prices in the agreed-upon materials costs.

86. Exhibit O to Modification 23 set the ceiling price for Onan at $1,457.32. This amount was included as a part of the negotiated per-vehicle price for materials of $191,771.

87. Onan's proposed unit price to BMY, dated October 5, 1978, was $1,457.32. This unit price was, however, subject to escalation.

88. The ceiling price of $1,457.32 adopted in Exhibit O was based on Onan's offer to BMY in the same amount. But, unlike that offer, the ceiling price failed to take into account that Onan's price was subject to escalation.

89. TACOM conducted negotiations with Onan and an agreement was reached on a unit price of $1,407.00 per engine, subject to escalation from April 1, 1979.

90. Subsequently, TACOM and Onan reached agreement on a firm, fixed price of $1,489.00 per engine including escalation, a price which exceeded the ceiling price of $1,457.32 set out in Exhibit O.

91. During the period January 12, 1979—June 12, 1980 BMY incurred direct escalation costs of $694,878.50. Of this amount, Berwick charged BMY escalation costs of $256,892.79 while Buckeye charged $438,085.71. These escalation charges were calculated pursuant to Form BMY 628. Had the contract between BMY and TACOM anticipated the escalation costs traceable to these two purchase orders, the contract price would have been increased by the following burdens and profit figures:

| | |
|---|---|
| Buckeye Escalation | $438,085.71 |
| Berwick Escalation | 256,892.79 |
| Total Escalation | $694,878.50 |
| Scrap .08% | 555.90 |
| Freight 1.25% | 8,692.93 |
| Subtotal | $704,127.33 |
| Material Handling 4.4% | 30,981.60 |
| Total Material | $735,108.93 |
| G & A 3.98% | 29,251.34 |
| Total Cost | $764,366.27 |
| Profit 10% | 76,436.63 |
| Cost of Money | 5,197.82 |
| TOTAL | $846,000.72 |

92. Despite its pricing mistake BMY did not suffer a loss on the materials portion of contract 0278 for 248 M88A1 recovery vehicles; it made a profit on this portion of the contract.

93. BMY has performed Contract 0278 and has delivered to TACOM the M88A1 tracked vehicles and conversion kits required under the contract. TACOM has accepted the items. BMY realized an overall profit of 2.6 percent on Contract 0278.